(Decided 9th December, 1880.)

---

FELIX MUNSHOWER *vs.* THE STATE OF MARYLAND.

*Evidence in a Trial for Murder—Gruber's Almanac.*

The State, in a trial of M. for murder, proved by K., that W., the alleged deceased, left K's house where W. was making his home, on Tuesday morning, August 5th, 1879, and proceeded up the public road towards Emmittsburg; that on the Sunday following W. not having made his appearance, K. went to the house of R., where M. was then staying, and inquired of M. whether he had seen anything of W.; that M. said he saw him on Tuesday, talked with him on the hill, when he left, saying he was going to Tom Shorb's and from there to town, and that he, M., then went to Motter's Station; that on Tuesday, the 12th, W's body was found buried in Myers' woods, with a wound in the back of the neck, two holes close together, as though both barrels of a gun had been fired at once into the neck, and the face was torn away; that about sixteen feet from the grave was a small ravine, which presented marks and the appearance of having been first used for the burial of the body; that there were leaves in it, and leaves had been raked out. The State then proved by S. that on the afternoon of

August 4th, he saw M. in Knode's woods sitting near the road; that he went to him and talked with him, and he asked S. if S. had seen anything of W. S. replied no, and said, why don't you go to the house; to which M. replied, I am not going there, Sarah, (meaning K's wife, and W's sister,) makes such a fuss; she knows my business better than I do; that a short time afterwards M. met S. near the barn on Kane's place, and asked S. if he was going to Zacharia's, and they then went together as far as Tom's creek; on the way they had some talk about the gun M. was carrying; M. shot a squirrel with the left hand barrel of the gun, reloaded it and remarked, that he kept the right hand barrel for long range, it shot better. Upon cross-examination, S. was asked whether on Monday, the 11th, before W's body was found, he had in a conversation with one G., in the public road, near the house of J. McC., told G. that W. had been murdered and buried under leaves in Myers' woods, and that his head had been mashed in. The State objected and the Court below refused to allow the question to be answered. On exceptions by M., it was HELD:

That the objection was properly sustained.

The State offered in evidence "Gruber's Almanac for 1879," for the purpose of proving at what hour the moon rose on the night of Saturday, August 9th, 1879, but M. objected to the admissibility of the almanac for said purpose. The Court below overruled the objection, and allowed the almanac to be offered in evidence. On exceptions by M., it was HELD:

That the evidence was admissible.

The State proved by F. that he was a witness at the coroner's inquest on August 13th, 1879; that, after all the witnesses had testified, M. was brought in and was told that if he desired it he could have the witnesses re-called; that the testimony of those who had been sworn was read over to M., and that, when that of F. was read over, to the effect that he had seen M. at Motter's Station on August 5th, between 10.30 and 11 A. M., M. turned to F. and said, I think you are mistaken about that, I was at the station about 9 o'clock that morning, and if you consult Mr. N., you will find that I am right, and I can prove that by H. R. and S. D. The State also proved by other witnesses, declarations of M. that he had arrived at Motter's Station at 9 A. M., on August 5th. M. then called H. R., and asked him whether he had been a witness on the inquest, to which he replied yes, and then further asked him whether he had not testified, on that occasion, that he saw M. at Motter's

Station on the morning of August 5th, about 9 o'clock, offering to show that H. R. had, previously to the statements and declarations by M., told a brother-in-law of M. that he had seen M. at said station at that hour, which was mentioned to M. by the brother-in-law; that this offer was made to show that the statement made by M. to F. was based upon the statement of H. R., and that H. R. was, in point of fact, mistaken about the time; the object being to rebut the charge that M. had attempted to set up an *alibi*, and to show that his mistake was the result of the error of H. R. The State objected, and the Court below refused to allow the question to be asked and answered, and the evidence to be offered. On exceptions by M., it was HELD:

That the objection was properly sustained.

APPEAL from the Circuit Court for Frederick County.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., MILLER, ALVEY, ROBINSON and IRVING, J.

*James McSherry* for the appellant.

The question excluded by the ruling of the Court below, as stated in the *first exception,* was admissible to discredit the witness. It is held that upon an indictment for murder, the admissions of other persons that they killed the deceased, are not evidence. But where the party making the admissions is produced as a witness against the accused, the witness' declarations that he is guilty of the offence, are admissible to discredit the witness. *Smith vs. State,* 9 *Alabama,* 990; *State vs. Duncan,* 6 *Iredell,* 326. See also 1 *Wharton's Crim. Law, sec.* 662.

As to the *second exception,* the best evidence of which the case in its nature is susceptible, is always required. The almanac in question was certainly not the best evidence, nor indeed any evidence of when the moon rose on that night. 1 *Starkie's Ev., sec. LXXV.*

It is said in 1 *Chitty's Pleading*, 218: "The Courts take notice of the days of the week, &c., on which particular days fall, and the almanac is part of the law of the land, having been established by different statutes."

But the almanac referred to by Chitty is that annexed to the Common Prayer Book. HOLT, C. J., in *Brough vs. Perkins*, 6 *Mod.*, 80.

By 24 *George* 2, *ch.* 23, the calendar annexed to the Common Prayer Book was declared erroneous, and a new calendar, tables and rules were substituted therefor.

It is of these matters that the Court takes judicial notice, and the calendar, tables and rules mentioned by this Act of Parliament are evidence; but the question involved in the exception under consideration is quite a different one. No such calendar or almanac was offered by the State, but one published without any sanction, and depending for its accuracy entirely upon the capacity of the individual who prepared the calculations. Besides, if the author of the work is living and accessible, he himself should have been produced, so that his means of knowledge might have been ascertained. *Morris & Gwynne, vs. Harmer's Heirs,* 7 *Peters,* 554.

The object of the evidence of Fisher, as stated in the *third exception,* was to show that the prisoner had attempted to set up an *alibi,* which was in point of fact false ; and that, therefore, failing in his *alibi,* he was the guilty party. *Wills' Circumstantial Ev., side page* 83.

Having adduced this inculpatory evidence against the appellant, it was clearly competent for him to show that the mistake was not his, but another's; that when he asserted that he was at Motter's Station, about nine o'clock, A. M., he was acting in good faith, because acting on information which had been imparted to him from a source that he had a right to credit. The sincerity of his statement was what was material. Though false in fact, if made *bona fide,* it was no evidence of guilt. 1 *Wharton's*

*Crim. Law, sec.* 663; 1 *Greenl. Ev., sec.* 101; *Friend, et al. vs. Hammill,* 34 *Md.,* 308.

*Charles J. M. Gwinn, Attorney-General,* for the appellee.

Upon the *first exception :* the rules of evidence are the same in civil and criminal cases. 1 *Bishop on Crim. Prac., 3rd Ed.,* 1880, *sec.* 1046.

The question at issue was whether the appellant was guilty of the murder whereof he stood charged. It neither tended to prove the guilt, or innocence of the accused, to show that a person, produced as a witness in the case, had stated in conversation with a stranger, before the body of Wetsell had been found, that Wetsell had been murdered and buried under leaves in Myers' woods; and that his head had been "mashed in." If the witness ever made such a remark, it might have tended to show that some facts, or circumstances, had been brought to his knowledge which induced him to form that opinion before the body was found. But it was not admissible to ask him whether he had expressed such an opinion; for to do this was to permit the witness to give utterance to an opinion without disclosing the grounds upon which that opinion was formed.

The question was not admissible for the purpose of impeaching the credit of the witness, by contradicting him, because the question was irrelevant to the issue. 2 *Taylor on Evidence, 6th Ed., sec.* 1292; and because the witness, in his examination in chief, had made no statement inconsistent with the opinion which the question implied that he had expressed as to the manner of Wetsell's death, and the place where his body was concealed.

The question was not admissible, upon cross-examination, because the witness upon his examination in chief had not made any statement as to his belief or opinion as to the manner of Wetsell's death, or the place, or mode, of his interment. *Phila. and Trenton R. R. Co. vs. Stimpson,* 14 *Peters,* 461.

Upon the *second exception :* the Act of 24 *George* 2, *ch.* 23, regulating the commencement of the year, and for correcting the calendar then in use, is in force in this State. *Killty's Report on Stats.,* 252; *Alexander's Brit. Stat.,* 767.

Under that statute the period primarily determined is the day on which the new year shall commence. 24 *George* 2, *chap.* 23, *section* 1. The statute does not say on what day each succeeding day of the new year shall fall. That is left to be computed from the fixed date supplied by the statute.

Now it must be conceded that a Court may inform itself of the day of the week on which a particular day of the month will fall, though that be matter of calculation, from the data furnished by the statutory beginning of the year, and may permit the jury, under its observation, to derive evidence of such fact, from a computation of such succession of days found in an almanac. *Page vs. Fawcett,* 1 *Cro. Eliz.,* 227; 1 *Stark. on Ev.,* 3rd *Eng. Ed.,* 509; 2 *Saund. Pl. & Ev.,* 722; *Kilgour vs. Miles and Goldsmith,* 6 *H. & J.,* 274; *Sasscer vs. Farmers' Bank,* 4 *Md.,* 420.

The designation of days in the computation of time, made in an almanac, necessarily involves the computation of the times marked by the natural divisions of each day—that is to say, among others, the periods of the rising and setting of the sun. The designations of the time of the full moon in each lunar month necessarily involves the computation of the times of the rising and setting of the moon in each day of each lunar month. These are not contingencies, which may, or may not happen, and the proof of the occurrence of which depends upon evidence. The precise periods at which the sun, or the moon, will rise or set, during any particular period of twenty-four hours of the future, is as absolutely certain as the occurrence of the day in which such rising, or setting will take place. If the computation of each day in its season, made in an

almanac, is evidence that such day will recur in such season, is not the equally certain computation of the rising and setting of the sun or moon, on such day, made in an almanac, equal evidence of the times when such events will occur ? These events are all equally matters of computation from data, which the statute provides in its designation of periods in the statutory year.

Weather reports, kept at an asylum, *De Armand vs. Neasmith*, 32 *Mich.*, 231; reports of the state of the markets, *Sisson vs. R. R. Co.*, 14 *Mich.*, 497; *Lush vs. Druse*, 4 *Wend.*, 317, and price currents, have been held to be admissible in evidence, *Cliquot's Champagne*, 3 *Wall.*, 140, though these are records which are not capable of mathematical demonstration, which cannot be tested by any certain law, and which may or may not, omit the record of changes which have actually taken place. But an almanac forecasts with exact certainty planetary movements. We govern our daily life by reference to their computations. No oral evidence, or proof, which we could gather as to the hours of the rising, or setting, of the sun or moon, could be as certain, or accurate, as that which we may obtain from such source. Why should not these computations, which are, after all, but parts of the ordinary computations of the calendar, be admitted as evidence ?

Upon the *third exception:* the question and proposed offer were not admissible, because the failure of an accused person to maintain a particular defence, upon which he relied when he was first suspected, or arrested, or on his trial, is not a circumstance which creates any legal presumption against him; and both question and answer were, therefore, immaterial. No evidence is admissible in a criminal trial, which does not tend to prove a fact,—or to rebut proof offered as to a particular fact,—or to rebut some presumption of law.

MILLER, J., delivered the opinion of the Court.

The appellant was indicted and tried for the murder of James L. Wetsell, and the jury, by their verdict, found him guilty of murder in the first degree. At the trial, his counsel took three exceptions to the rulings of the Court upon questions of evidence, which this appeal brings up for review, and we shall dispose of them in their order.

*First Exception.* The State proved that early on Tuesday morning, the 5th of August, 1879, Wetsell left the house of Knode, where he was making his home, and proceeded up the public road towards Emmittsburg. On the Sunday following, Wetsell not having made his appearance, Knode went to the house of one Rentzell, where the prisoner was staying, and inquired of him whether he had seen anything of Wetsell, and the prisoner said he saw him on Tuesday, talked with him on the hill, when he left, saying he was going to Tom Shorb's, and from there to town, and that he, the prisoner, then went to Motter's Station. On Tuesday, the 12th of August, Wetzell's body was found buried in Myers' woods, with a wound in the back of the neck—two holes close together as though both barrels of a gun had been fired at once into the neck— and the face was torn away. About sixteen feet from the grave there was a small ravine which presented marks and the appearance of having been first used for the burial of the body; there were leaves in the place, and some leaves had been raked out. The State then proved by Thomas Shorb, that on the afternoon of the 4th of August, he saw the prisoner in Knode's woods sitting near the road, and he went to him and talked with him; he asked witness if he had seen anything of Wetsell, and witness answered no, and said, why don't you go to the house? to which the prisoner replied, I am not going there, Sarah (meaning Knode's wife and Wetsell's sister) makes such a fuss, she knows my business better than I do; that a short time afterwards prisoner met witness near the barn

on Kane's place and asked him if he was going to Zacharia's, and they went together as far as Tom's Creek; on the way they had some talk about the gun the prisoner was carrying; he shot a squirrel with the left hand barrel, reloaded it, and remarked that he kept the right hand barrel for long range, it shot better. Upon cross-examination this witness was asked whether on Monday the eleventh, before the body of Wetsell was found, he had, in a conversation with Otho Grimes, in the public road, near the house of John McCarthy, told Grimes that James Wetsell had been murdered and buried under leaves in Myers' woods, and that his head had been mashed in? The Court, upon objection made by the State, refused to allow the question to be answered, and to this ruling the prisoner excepted.

Counsel for the appellant contend that an answer to this question was admissible for the purpose of discrediting the witness; that if he had answered the question in the negative he would have been contradicted and discredited by the impeaching witness, and if he had answered in the affirmative it would have evidenced the possession of knowledge that the guilty party alone would be likely to have, and this would have discredited him. They admit that on a trial for murder the admissions or declarations of third persons that they killed the deceased are not evidence, but they insist that if such third persons, on being examined as witnesses, *implicate the prisoner by their testimony*, evidence of their declarations that they were guilty of the offence is admissible to discredit the witnesses. This proposition is broadly stated in 1 *Whart. Cr. Law*, sec. 662, and runs through all the editions of that valuable book. The only authority, however, cited in its support is the case of *Smith vs. The State*, 9 *Ala.*, 990. An examination of that case has convinced us that the learned author has fallen into error in stating the proposition thus broadly, or has misapprehended the deci-

sion actually made by the Court. In that case, Smith, a slave, was on trial for the murder of Edmund, another slave, and the witness, Sam, had been tried and acquitted the day before of the same murder. On the trial of Smith, Sam was examined as a witness by the State and denied any knowledge of the murder of Edmund, or of the participation of Smith in it, but stated some circumstances tending to implicate Smith. The prisoner's counsel then offered to prove, that while the trial of Sam was in progress, he, being at the time in jail, became alarmed and desired Neal, a white man then present, to request the jailor to send for his master, and then stated in Neal's presence that he, Sam, had wrongfully accused the boy Smith of the murder of Edmund, and he wished so to tell his master, that he did not wish to die with a lie in his mouth, and cause the innocent to suffer, and the question was, whether this was admissible in evidence on the trial of Smith *for any purpose.* The opinion of the Court was delivered by ORMOND, J., and he says—" In my opinion it was mere hearsay. It appears that Sam had previously stated, that Smith, a few days after the death of Edmund, had told him that he killed Edmund with a gun-barrel, and it appears to me very clear that the only rational meaning that can be put upon the declarations of Sam, in jail, is, that he had accused Smith falsely to his master. His own trial was then in progress, he apprehended it would ·terminate fatally, and was thus impelled to make the confession. It cannot, in my opinion, by any just rule of interpretation, be construed into an admission that he was himself guilty of the murder of Edmund. This being the true meaning of the declaration, if Sam, when Smith was on trial, *had repeated* the false charge against him, the admission made in jail would certainly have been competent testimony to discredit him." This is all the Court decides in reference to the admissibility of these declarations, for the purpose of discrediting the

Munshower *vs.* The State.

witness, and it simply amounts to this, that where a witness has testified to any matter of fact, material to the issue, about which he has made a different statement to others, such statement, if denied by him, may be given in evidence to discredit or impeach him. This proposition is so plain and well settled as not to need this authority to support it, and that this was all the Court intended to decide, is perfectly obvious from what follows, for the learned Judge proceeds to say, that as Sam, in his testimony did not repeat the charge, but denied any knowledge of the participation of Smith in the murder, he was of opinion the admission made in jail " was not testimony for any purpose," and he then adds:—" It appears that Sam, in his testimony, had detailed some facts calculated to connect Smith with the murder, or as stated in the bill of exceptions, ' tending to implicate Smith,' but his testimony as to these *independent facts* could not be impeached by proving that he had previously made a false declaration about Smith which he afterwards recanted, such declarations having *no connection with the facts deposed to.* It is an established rule of the law of evidence, that collateral matters cannot be thus introduced for the purpose of impeaching a witness." But the decision goes still further, and the Judge says:—" Conceding, however, the true meaning of these declarations of Sam in jail to be an admission of his own guilt, and that he had killed Edmund himself, it does not, as I think, *vary the case in the slightest degree.* The question to be ascertained was, whether Smith was guilty of the murder, and any *fact or circumstance* tending to prove that another was the guilty actor would be clearly competent, as its tendency would be to disprove the guilt of the accused. But I think it is perfectly clear that these *declarations* were not *facts* but mere *hearsay ;* not made under the sanction of an oath ; not obligatory on the person making them ; and certainly could not be testimony either for or against any one else."

In his dissenting opinion, GOLDTHWAITE, J., thought the evidence offered was admissible, but he does not place his decision upon the ground that it was admissible for the purpose of discrediting the witness. He says:—"The effort of the prisoner was to show such a condition of facts and circumstances as to create the impression on the minds of the jury that Sam, in point of fact, was the murderer, the evidence against himself being, as stated, entirely circumstantial. I apprehend, although it may be true, that the confession of a third person of his guilt is not evidence in favor of another when *standing alone,* and unaided by other facts or circumstances, yet that it is so, whenever the party confessing is *connected with the crime by strong presumptive circumstances."* In the present case there is nothing to bring the supposed declaration of Shorb to Grimes within the doctrine even of this dissenting opinion. The declaration, if ever made, stands alone, for the record discloses no facts or circumstances whatever, tending to connect Shorb with the crime. The Alabama case sustains in fact the very opposite position from that for which the appellant's counsel have contended, and we know of no authority nor any rule of evidence that would permit this question to be answered. The witness, in his examination in chief, had made no statement *inconsistent* with the declaration which the question implied he had made in reference to the manner of Wetsell's death and the place where the body was buried and concealed. If he had answered in the negative, he could not have been contradicted, for it is well settled that no question respecting any matter irrelevant to the issue can be put to a witness on cross-examination, for the mere purpose of impeaching his credit by contradicting him, and if any such question be inadvertently put and answered, the answer of the witness is conclusive. 2 *Taylor's Ev.,* sec. 1292. He was not bound to answer in the affirmative if the declaration would tend to inculpate himself, and if he

chose so to answer voluntarily, then to allow the answer would be to permit his own antecedent declarations when proved by himself as a witness, to go to the jury as evidence to exculpate the prisoner, when it is clear the same declarations could not, for that or any other purpose, be proved by any other witness. To allow the introduction of such testimony would effect a dangerous innovation upon the law of evidence in criminal cases, and open the door to the most fraudulent contrivances to procure the acquittal of parties accused of crime. We therefore entertain no doubt as to the correctness of the ruling in this exception.

*Second Exception.* It was conceded that it became material and competent for the State to prove at what hour the moon rose on the night of Saturday, the 9th of August, 1879, and for the purpose of proving this, the State offered in evidence Gruber's Almanac for the year 1879. The prisoner objected to its admissibility, but the Court overruled the objection and allowed the almanac to be offered for the purpose stated. To this ruling the prisoner excepted.

This is all the exception states in regard to the almanac offered, and we must assume that it contained tables giving the periods of the rising and setting of the sun and moon on each day of the year, such as are usually found in such works. The prisoner did not propose to offer proof assailing or impeaching the accuracy of the astronomical calculations upon which the tables in the particular almanac in question were made, but his counsel contend that the almanac was not the best evidence, nor indeed any evidence as to when the moon rose on that night. The argument is, that it was a mere calculation made by some one long *anterior* to the happening of the event, that the event *would* occur at a certain hour and minute; it was not evidence that the moon *had risen* at a certain hour, but the statement of a *conjecture* that it *would* do so.

On the 2nd of January, 1880, when this case was on trial, there were certainly better and surer means of proving when the moon did *actually* rise on the 9th of August, 1879, than by relying on the computation of an almanac maker that it *would* or *ought* to rise at a given time that night: how is the fact that it *did* rise at a particular hour proved by tendering as evidence the *conjecture* or *calculation* of some one that it would do so?—If Gruber's Almanac is evidence for this purpose, so then are all the other various ones published, because there is nothing in this one to make it more authentic than the others, and thus a fact susceptible of *exact* proof like any other event that has happened, may be established by the unsworn *conjecture* of almanac compilers. We do not propose to elaborate the question, nor to rely upon the fact that the Statute of 24 Geo. 2, ch. 23, is in force in this State. As has been well argued by the Attorney-General in his brief, the precise periods at which the sun and moon will rise or set at any particular period of twenty-four hours *in the future* is as absolutely certain and just as capable of exact mathematical ascertainment, as the occurrence of the day in which such setting or rising will take place. Courts have received as evidence weather reports, reports of the state of the markets, price currents, and insurance tables tending to show the probable duration of human life, though these are records which are not capable of mathematical demonstration, which cannot be tested by any certain law, and which may or may not omit the record of changes which have actually taken place. But an almanac forecasts with exact certainty planetary movements. We govern our daily life by reference to the computations which they contain. No oral evidence or proof which we could gather as to the hours of the rising or setting of the sun or moon could be as certain or accurate as that which we may obtain from such a source. Why then should not these computations, which are, after all, but parts of

the ordinary computations of the calendar, be admitted as evidence? As was said by Judge Cooley in considering an analogous question, (*Sisson vs. Railroad Co.*, 14 *Mich.*, 497,) "Courts would justly be the subject of ridicule if they should deliberately shut their eyes to the sources of information which the rest of the world relies upon, and demand evidence of a less certain and satisfactory character." There is clearly no error in the ruling in this exception.

*Third Exception.* From this exception it appears the State proved by Fisher, that he was a witness at the coroner's inquest on the 13th of August, 1879, that after all the witnesses had testified the prisoner was brought in and told that if he desired it, he could have the witnesses recalled, that the testimony of those who had been sworn was read over to him, and when that of Fisher was read to the effect that he had seen the prisoner at Motter's Station on the 5th of August between 10.30 and 11 A. M., the prisoner turned to Fisher and said I think you are mistaken about that, I was at the station about 9 o'clock that morning, and if you consult Mr. Naill you will find I am right, and I can prove that by Harry Rayman and Singleton Dorsey. The State also proved by other witnesses, declarations of the prisoner, that he had arrived at Motter's Station at 9 A. M. on the 5th of August. The prisoner's counsel then called Harry Rayman and asked him whether he had been a witness on the inquest, to which he replied, yes, and then further asked him whether he had not testified on that occasion that he saw the prisoner at Motter's Station on the morning of the 5th of August about 9 o'clock. Offering to show that this witness had previously to the statements and declarations by the prisoner, told a brother-in-law of the prisoner that he had seen the prisoner at the station at that hour, which was mentioned to the prisoner by the brother-in-law. Counsel then stated that this offer was made to show that the statement made

by the prisoner to Fisher was based upon the statement of Rayman, and that Rayman was in point of fact mistaken about the time, the object being to rebut the charge that the prisoner had attempted to set up an *alibi*, and to show that his mistake was the result of the error of Rayman.   The Court sustained the State's objection, refused to allow the question to be asked and answered, and the evidence to be offered, and to this ruling the prisoner excepted.

It is not plainly stated in this exception that the brother-in-law communicated Rayman's statement to the prisoner *before* his declarations at the inquest were made, a fact which, in any aspect of the case, was *essential* to the admission of this evidence.   But apart from this we are clearly of opinion the ruling was correct.   The statement which the prisoner made at the inquest was the assertion of a *fact* about which he himself had positive knowledge. There is nothing to show he was ignorant of the time he arrived at the station, or that he was not just as capable of judging of it, or ascertaining it, as any one else, and he could hardly have made a mistake of nearly two hours. He positively asserted he was there about nine o'clock, and averred he could prove it as a fact by two or three witnesses.   We do not think it was competent for him to escape the damaging effect of a false statement of his whereabouts on that morning, by proving that Rayman had told his brother-in-law he had seen him there at that time, and that the brother-in-law had told him that Rayman had so stated.   In our judgment such evidence does not prove or tend to prove that his positive assertions at the inquest were the result of an honest mistake, brought about by the fact that the mistaken declaration of Rayman had first been communicated to him.

Finding no error in the rulings to which the appellant has excepted, it becomes unnecessary to notice the exception taken by the State.   These rulings are the only

matters brought up for review by this appeal.   The result is, they must be affirmed, and the cause remanded.

*Rulings affirmed and*
*cause remanded.*

(Decided 9th December, 1880.)