## ANTONIO LANASA *vs.* STATE OF MARYLAND.

*Conspiracy—Sufficiency of Indictment—Repugnancy Between
Verdicts on Different Counts—Constitutional Law — Cruel
Punishment—Election Between Counts—Bill of Particulars—
Uncorroborated Evidence of Co-Conspirators—Evidence to
Discredit or Corroborate Witness—Privileged Communica-
tions.*

A combination between two or more persons to accomplish by
unlawful means an object not in itself criminal, or to accom-
plish an unlawful object, is an indictable conspiracy, although
no act is done in furtherance of the object.

The offense of conspiracy is complete in such cases by the un-
lawful agreement and combination of the parties.

An indictment charging that the defendant conspired with others wilfully and maliciously to injure and destroy the property of a named person is valid, and it is not necessary that the indictment should describe the particular property which was the object of the conspiracy.

The crime of conspiring to destroy a man's property is completed by the combination, although the conspirators have not determined what particular property should be destroyed.

The seventh and eighth counts of an indictment charged the defendant with a conspiracy wilfully and maliciously to injure and destroy the property and dwelling house of one Di G. The third count charged a conspiracy to injure and destroy the property of Di G. The defendant was acquitted on the seventh and eighth counts and found guilty on the third. *Held,* that there is no repugnancy between these verdicts.

When the count in the indictment under which the defendant was convicted was sufficient in law, his sentence thereunder is not in violation of the constitutional provision, that in criminal prosecutions the accused shall have the right to be informed of the nature of the accusation against him and shall not be deprived of life or liberty without due process of law.

Threatening letters demanding money had been sent to one Di G. by members of a gang called the Black Hand. He refused to comply with the demand, and a dynamite bomb was exploded in the rear of his dwelling house, causing much damage. The defendant was found guilty of a conspiracy to injure and destroy Di G.'s property, and a sentence of ten years' imprisonment was imposed. *Held,* that this sentence is not a cruel or unusual punishment within the constitutional inhibition.

A motion by a traverser in a criminal case to require the State to elect between certain counts in the indictment is addressed to the discretion of the trial Court, and no appeal lies from its action thereon, unless there be some abuse of the discretion resulting in injury to the traverser.

Under an indictment for conspiracy, a motion by the traverser to require the State to file a bill of particulars is addressed to the discretion of the trial Court.

The crime of conspiracy may not be established upon the un-

corroborated evidence of accomplices and co-conspirators, connecting the accused with the crime.

Evidence is admissible to discredit a witness by showing that he had made statements as to material facts in conflict with his testimony at the trial.

When the testimony of a witness as to certain facts has been contradicted, he cannot be corroborated by evidence in rebuttal showing that thirty-nine days after the happening of the event testified to, he made statements, not under oath, similar to his testimony.

Statements made to a lawyer are not privileged communications and as such inadmissible in evidence, unless made while the relation of attorney and client existed between the parties, or unless made during negotiations looking to the establishing of such relation and which concerned professional advice.

When three persons were indicted for conspiracy, statements made by one of them to counsel for another, who was not the legal adviser of the person making the statement, are not privileged communications, although, after they were made, there was some talk of his becoming also counsel for the one making the statement, but no such relation was ever established between them.

*Decided January 15th, 1909.*

Appeal from the Criminal Court of Baltimore (WRIGHT and STOCKBRIDGE, JJ.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*Thomas G. Hayes* and *William L. Marbury* (with whom were *Geo. Dobbin Penniman* and *W. Purnell Hall* on the brief), for the appellant.

*Isaac Lobe Straus, Attorney-General,* and *Eugene O'Dunne, Deputy State's Attorney* (with whom was *Albert S. J. Owens, State's Attorney,* on the brief), for the appellee.

BURKE, J., delivered the opinion of the Court.

1. Antonio Lanasa, together with certain named persons, was indicted in the Criminal Court of Baltimore for the crime of conspiracy. That Court, upon his motion, granted a severance as to him, and after a lengthy trial he was convicted upon the third count of the indictment, and was sentenced to be confined in the Baltimore City Jail for the term of ten years. From that judgment he has brought this appeal.

The indictment contains ten counts. The appellant filed a general demurrer to the indictment and also demurred to each count. The second, fourth and ninth counts were quashed by the Court upon motion of the State's Attorney. The demurrer to the indictment and to each count thereof was overruled. The traverser then moved the Court to require the State to elect as to the third, seventh and eighth counts, which motion the Court overruled. He was found guilty upon the third count, but was acquitted upon the six remaining counts. Motions for a new trial and in arrest of judgment were filed. He abandoned the motion for a new trial, and the motion in arrest of judgment was overruled by the Supreme Bench of Baltimore City.

The object of the conspiracy charged in the counts of the indictment upon which he was tried was as follows:

1. Feloniously, wilfully and of their malice aforethought to kill and murder Joseph Di Giorgio.

3. To wilfully and maliciously injure and destroy the property of Joseph Di Giorgio.

5. Feloniously, wilfully and of their malice aforethought to kill and murder certain members of the family and household of the said Joseph Di Giorgio.

6. Unlawfully to wound, hurt and injure certain members of the family and household of the said Joseph Di Giorgio.

7. Unlawfully to wilfully and maliciously injure and destroy the property and dwelling house of the said Joseph Di Giorgio.

8. Unlawfully to wilfully and maliciously injure and de-

stroy the property and dwelling house then and there being of the said Joseph Di Giorgio.

10. Unlawfully to extort and obtain unto themselves from the said Joseph Di Giorgio certain money and property of the said Joseph Di Giorgio.

The fifth and sixth counts set out the names of the persons who were intended to be injured, and the eighth and tenth counts set out certain overt acts done in pursuance of the conspiracy.

It is important to note that Joseph Tamburo and Salvatore Lupo are named as co-conspirators with Lanasa in each count of the indictment, and that upon the evidence of these two men the State relied to connect the appellant with the crime of which he was convicted. These two facts become of great importance when we come to consider the exceptions taken to the rulings of the Court upon the evidence. Phillipi Rei, who is frequently referred to in the record, was an Italian, who, it is alleged, was induced by Lanasa to become one of the co-conspirators. Rei was killed in Pittsburg by a fellow-countryman named Cinceria a day or two before the explosion at Di Giorgio's home. On March 30th, 1908, Lupo pleaded guilty to the eighth count, and after the conviction of Lanasa was sentenced to jail for fifteen months, and two days after Lanasa's conviction the State entered a plea of not guilty as to Tamburo.

It was contended with great earnestness and ability by the distinguished counsel for the appellant that the demurrer to the third count should have been sustained—first, because it charges no crime; secondly, because it does not sufficiently describe the object of the conspiracy. In support of the motion in arrest of judgment, in addition to the reasons assigned for grounds of the demurrer, it was urged, first, that there is an absolute and necessary repugnancy between the verdicts rendered by the jury, in that it is shown by the record that by the verdict of not guilty upon the seventh count of the indictment the traverser was acquitted of the identical crime for which he was convicted upon the third count; secondly,

because the judgment deprives the appellant of his liberty without due process of law in violation of the Fourteenth Amendment of the Constitution of the United States, and constitutes a cruel and unusual punishment in violation of the Constitution of the United States and of the Maryland Declaration of Rights.  In the elaborate briefs filed by the counsel for the appellant and the State these questions have been fully discussed, and many cases both in this country and in England upon the law of conspiracy have been called to our attention.  It is apparent that upon this subject, as upon most others, there is much real or apparent conflict to be found in the adjudged cases.

Upon the settled law of this State and upon the authority of well-reasoned cases in other jurisdictions, we cannot agree that the count assailed is in any respect defective, or that the judgment should be arrested.  A conspiracy may be described in general terms, as a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose; or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.  It is not essential that the act intended to be done should be punishable by indictment.  The *essence* of the offense consists in the *unlawful agreement and combination* of the parties; and, therefore, it is completed whenever such combination is formed, although no act be done towards carrying the main design into effect.  3 *Greenleaf on Evidence,* 2nd Ed., Secs. 89-91.  It may be said that this statement of the law by Mr. Greenleaf announces the almost universally accepted doctrine upon the subject of criminal conspiracy.  This is made perfectly apparent by the numerous citations from text books and reports contained in the briefs filed in this case.  It is the rule which has obtained in this State since the great case of the *State* v. *Buchanan,* 5 H. & J. 317, in which will be found a collection of many cases in which an unexecuted conspiracy to commit acts not in themselves indictable offenses was held to be a criminal conspiracy.  In the course of his opinion in that case, JUDGE BUCHANAN said: "In 1 *Hawk. P. C.* 190,

ch. 72, it is said: 'There can be no doubt, that all combinations whatsoever, wrongfully to prejudice a third person, are highly criminal at common law.' This is literally adopted and transcribed into 1 *Burn's Justice,* 378, and 3 *Wilson's Works,* 118. *Chitty,* in his 3rd Vol. *on Criminal Law,* 1139, says: 'In a word, all confederacies wrongfully to prejudice another are misdemeanors at common law, whether the intention is to injure his property, his person, or his character.' And in 4 *Blackstone Com.* 137 (Christian's Note 4) : 'Every confederacy to injure individuals, or to do acts which are unlawful or prejudicial to the community, is a conspiracy.' "

We cannot for a moment doubt that a combination and agreement between two or more persons wilfully and maliciously to injure and destroy the property of a third person is a completed criminal conspiracy, and is the subject of an indictment. Nor is it necessary to the completion of the crime that the conspirators should determine in advance what particular property should be injured or destroyed. To hold that the law cannot interpose and arrest by criminal procedure the malicious purposes of the conspirators, unless they had agreed upon the destruction of some particular property would strip it of its most beneficent preventive powers and leave the confederates at liberty to consummate their wicked purposes. The law is not so impotent and ineffective. As it is not essential to the completion of the offense that any particular property should be destroyed, it is ,therefore, not required that the object of the unexecuted conspiracy should be set out with great particularity and certainty in the indictment, because only such facts need be stated as shall fairly and reasonably inform the accused of the offense with which he is charged. To require more in such a case would be to put an unnecessary burden upon the State, and make it impossible in many cases to secure the conviction of the guilty. The position taken by the State, that in a prosecution for such an offense as that charged in the third count, the indictment need not particularly describe the *property,* the injury or destruction of which was the object of the conspiracy, is well supported.

by the authorities.  2 *Bishop, New Criminal Procedure,* secs.
204, 7, 8 ; 2 *Wharton's Criminal Law,* ch. 21 ; *U. S.* v. *Mc-
Kinley,* 126 Federal Reporter, 242 ; *Dealey* v. *The United
States,* 152 U. S. 539 ; *United States* v. *Stevens,* 44 Fed. Rep.
132, 141 ; *State* v. *Straw,* 42 N. H. 393 ; *Reinhold* v. *State,*
130 Ind. 467 ; *People* v. *Clarke,* 10 Mich. 314 ; 8 *Cyc.* 664,
666.

We are of opinion that the third count charged the defend-
ant with a common law conspiracy and sufficiently informed
him of the crime charged.  The objection against it is purely
technical, as it is not pretended that he was in the slightest
degree injured or prejudiced by the general and indefinite de-
scription of the property, the destruction of which is charged
to have been the object of the conspiracy.  On the contrary,
the record shows that he was well informed as to the accusa-
tion against him.

Nor can we discover any necessary repugnance between the
verdict of guilty on the third count, and the verdicts of acquit-
tal on the seventh and eighth counts.  In those counts the
object of the conspiracy was alleged to be "to injure and de-
stroy the property and dwelling house of Joseph Di Giorgio."
The jury might have very reasonably concluded that while
the evidence, in their judgment, did not fully support the alle-
gations of these counts, it did satisfy them that it was the
purpose of the accused to injure and destroy some of Mr. Di
Giorgio's property.  We must conclude that they were so con-
vinced by the verdict of guilty upon the third count and the
acquittal upon the others.  The sufficiency of the evidence
was a question for the jury, and this Court upon a motion in
arrest of judgment has no power to review their finding.  We
said in *Hiss* v. *Weik,* 78 Md. 446, that, "as an appellate Court
we cannot review the findings of the jury upon matters of
fact, nor can we pass upon the comparative weight of the con-
flicting evidence submitted to them.  If no error of law had
been committed by the inferior Court in any of its rulings,
the verdict of the jury, whether right or wrong, just or un-
just, and even though it be directly against and in the very

teeth and face of the preponderance of evidence, cannot be interfered with here; and there is no power lodged elsewhere to set the verdict aside, except with the judge before whom the case was tried." Much that was said in argument in support of the motion in arrest of judgment cannot be considered by this Court; but could have been appropriately addressed to the trial Court upon an application for a new trial.

It is insisted by the appellant that the indictment, trial, verdict, judgment and sentence violate the Sixth, Eighth and Fourteenth Amendments of the Federal Constitution, and the Sixteenth and Twenty-first Articles of the Maryland Declaration of Rights. The Sixth Amendment provides that in all criminal prosecutions the accused shall enjoy the right to be informed of the nature and cause of the accusation; and the Fourteenth declares that no State shall deprive any person of life, liberty or property without due process of law. Practically the same declarations are found in the Twenty-first and Twenty-third Articles of the Declaration of Rights of this State. The object of these provisions was to declare and secure the pre-existing rights of the people as those rights had been established by usage and the settled course of law. We take it to be settled that when a person accused of crime within a State is subjected, like all other persons, to the law in its regular course of administration in the Courts of justice, he cannot be heard to say that the proceedings and judgment were without due process of law, because law, in its regular and orderly administration through the Courts, is due process of law within the meaning of the constitutional provision, and when the rights of the citizen are thus secured by the law of the State the requirements of the Federal Constitution are gratified. Having hereinbefore held that by the law of this State the third count of the indictment is sufficient, it necessarily follows that the appellant has been deprived of no right secured to him either by the Twenty-first Article of the Maryland Declaration of Rights, or the Sixth or Fourteenth Amendment of the Federal Constitution.

It is urged that the judgment should be reversed because it

constitutes a cruel and unusual punishment in violation of the provisions of the Maryland Declaration of Rights and of the Constitution of the United States. In support of this contention the appellant relies upon the Eighth Amendment of the Federal Constitution, which forbids the infliction of cruel and unusual punishment; and upon Article sixteen of the Maryland Declaration of Rights, which declares that no law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time hereafter. To dispose of this question we must understand the real crime of which the accused was charged. Di Giorgio was a prominent business man living in Baltimore City and engaged in the importation of fruit to the Baltimore market. He lived with his wife and family at Walbrook. In order to extort money from him threatening letters demanding money were sent him by an organization or society of men known as "The Black Hand." He declined to comply with these demands, and on the night of December 10, 1907, a dynamite bomb was placed in the rear room of his dwelling house and exploded, terrorizing the occupants of the house and causing much damage. Whatever may have been the motive which prompted this act, whether it was an attempt to murder Di Giorgio and his family in revenge for his refusal to pay over money in response to demands made upon him, or had for its ultimate purpose the coercion of Di Giorgio by personal violence into a compliance with these demands, there can be no two opinions as to the heinousness of the crime. It was an act characterized by the most malicious and diabolical wickedness, and should be punished with the greatest severity. We do not think that a sentence of ten years for such a crime would be open to any constitutional or other objections. In the case of *Mitchell v. The State,* 82 Md. 527, where the accused had been sentenced to jail for a term of fifteen years upon a conviction for an assault with intent to commit a rape, this Court passed upon the very question now before us, and held that the sentence was not a cruel and unusual punishment within the constitutional prohibition. It is said in that case that "our

law inflicts pain not in a spirit of vengeance, but to promote the essential purposes of public justice. Severity is not cruelty. The punishment ought to bear a due proportion to the offense. Crimes of great atrocity ought to be visited with such penalties as would check, if not prevent, their commission. It is impossible in the abstract to mark the boundaries which separate cruelty from just severity. If the circumstances which accompany the crime are of unusual aggravation, the punishment ought to be unusually severe. But the Courts must adopt the methods of punishment prescribed by law. No one ought to imagine that in a free country a Court would have the power to devise new and singular modes of punishment. Its duty is *dicere non facere legem*. Even where the law confides to the judge the imposition of the sentence without definite limit, it still may be possible to violate the declaration of rights. If the punishment is grossly and inordinately disproportionate to the offense, so that the sentence is evidently dictated not by a sense of public duty, but by passion, prejudice, ill-will or any other unworthy motive, the judgment ought to be reversed and the cause remanded for a more just sentence." While the sentence in this case is severe, it is not open to the objection of being in the sense of the law cruel or unusual.

We cannot review the action of the lower Court in refusing to require the State to elect between certain counts and in overruling the appellant's demand for a bill of particulars. Those motions were addressed to the sound discretion of the Court, and its action upon them is not the subject of an appeal in the absence of some gross abuse of discretion in the lower Court resulting in injury to the accused, and we find nothing of that kind in this case. *Warren* v. *Twiller*, 10 Md. 39; *Gibson* v. *The State*, 54 Md. 453. In *Gibson's Case* it is said: "No question has been raised in this Court to the refusal of the Court below to compel the State to elect on which count the prisoner should be tried. The practice is well settled in this State that such a motion is addressed to the discretion

of the Court, and is not a subject of appeal or writ of error. *State* v. *Bell,* 27 Md. 677."

It is unnecessary to multiply authorities on this question, as they are practically unanimous in support of the doctrine stated by this Court.

2. This brings us to the consideration of the thirty-six bills of exception reserved by the accused to the rulings of the trial Court upon questions of evidence. We have given these careful consideration, but we do not think it necessary to discuss them all separately. We find no reversible error in the first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, fifteenth, seventeenth, eighteenth, nineteenth, twentieth, twenty-first, twenty-second, twenty-third, twenty-fourth, twenty-sixth, twenty-seventh, twenty-eighth and twenty-ninth exceptions. There was, however, serious error committed by the Court in the sixteenth, twenty-fifth, thirtieth, thirty-first, thirty-second, thirty-third, thirty-fourth, thirty-fifth and thirty-sixth exceptions. The State relied largely upon the testimony of Tamburo and Lupo to connect Lanasa with this crime. Both were under indictment, and upon the uncorroborated evidence of accomplices, connecting Lanasa with the crime, the law does not permit a conviction to stand. *Wharton's Crim. Evidence,* 8th Ed., sec. 441-442.

Lupo pleaded guilty and turned State's evidence, in the hope and expectation of a light sentence, and in this he was not disappointed. According to his own testimony, he was induced to become a witness for the State by a statement made to him by the State's Attorney. He testified: "As a result of my having plead guilty and turning State's evidence I get from the State a request or beg the Court to give my liberty in order to take care of my family and provide for my family. I was forced to declare myself guilty because I knew all about it. I do not know how much the State's officers will endeavor to reduce my sentence for having plead guilty to the eighth count; I do not know anything; the Court knows when the prosecuting attorney will ask the Court; whatever they

will give me I do not know anything about it. All the State's Attorney told me is this: That if you will tell us what you know—we don't want any lies from you—but if you tell us what you know we will ask the Court to sentence you to eighteen months. I pleaded guilty before the State's Attorney spoke to me about these things; before he ever told me anything about it I pleaded guilty. *The State's Attorney promised me if I plead guilty that he would ask the Court to give me eighteen months; he didn't tell me he would give me eighteen months, but he would ask the Court to give me eighteen months.*" He testified to facts which, if believed by the jury, not only connected Lanasa with the crime, but which showed that he was the head and front of the whole conspiracy—the originator and master spirit of the whole nefarious business. After Lanasa's conviction the State confessed a plea of not guilty against Tamburo, who also had testified to certain things which will be presently alluded to, which tended to show Lanasa's participation in the crime.

The appellant testified in his own behalf, asserting his innocence and denying all the acts imputed to him by the State. It is, therefore, perfectly obvious that the result of the trial resolved itself into the question of the credibility of Lupo and Tamburo. The question of the appellant's liberty seems to have depended upon his ability to break down the evidence of these two men by convincing the jury that they were attempting, for selfish purposes, by false and perjured testimony to secure his conviction of a crime of which he was entirely innocent. In this situation it was vitally important to the appellant that all testimony legally admissible to weaken the force and affect the credibility of these witnesses should have been submitted to the jury. He had a right to show that they had made to others contradictory statements as to the material facts testified to by them at the trial. This was the object of the proffered evidence embraced in the sixteenth and twenty-fifth exceptions. "When a witness has testified to any matter of fact material to the issue, about which he has made a different statement to oth-

ers, such statement, if denied by him, may be given in evidence to discredit or impeach him. *Munshower* v. *The State,* 55 Md. 21."

The sixteenth exception was taken during the cross-examination of Lupo, who had pleaded guilty to the eighth count of the indictment, which charged an executed conspiracy, the overt act charged in that count being the explosion of dynamite which had been placed under and near the property and dwelling house of Di Giorgio, his plea of guilty to that count having been entered under the circumstances stated above. He testified fully to Lanasa's participation in the crime; had told of certain meetings of himself, Lanasa and Rei in Pittsburg, and of the circumstances under which he had come to Baltimore and the object of his visit; but claimed that he was not present when the dynamite was exploded. He testified that Lanasa said in Pittsburg to Rei: "That a bomb ought to be throwed into the house of Mr. Di Giorgio, of Mr. Joseph Di Giorgio;" that Lanasa said to witness: "Come to Baltimore, as I want to put a bomb in the house of Di Giorgio;" that Lanasa gave him ten dollars to come to Baltimore "to put the bomb into the house of Mr. Di Giorgio;" that he told Lanasa that he was not good for that kind of business, and that Lanasa said he had two other men; that he would give me two other men to do the business." He further testified that he reached Baltimore on the 11th of December at four o'clock in the morning, and went to a hotel and remained there until about nine o'clock A. M. of that day; that he afterwards saw Lanasa and told him that Rei was dead, and that the traverser said: "My best friend was killed in Pittsburg, and I have sent two men to rob the house of Joseph Di Giorgio." "I did not say, 'rob the house.' The interpreter misunderstood me. He told me: 'My best friend, Philipi Rei, was killed in Pittsburg, and I have sent two men to blow up the house of Di Giorgio.' " He further testified that he went that day to the house of Lanasa, who took him upstairs, and that Lanasa there, in the presence of two people, repeated again: "My best friend was killed in Pitts-

burg, Philipi Rei, and I have taken two young fellows and
sent them to blow up the house of Joseph Di Giorgio;" that
he came here for the purpose of blowing up the house, and
learned after he reached here from Lanasa that the house had
been blown up.   Lupo, on the 10th of January, 1908, in
Cleveland, Ohio, had made a written statement of his par-
ticipation in the crime in the presence of Captain A. J.
Pumphrey and two other officers.   In this statement, which
is called in the record a confession, he stated that he heard
Lanasa say to Rei: "I wish you would come to Baltimore
tomorrow.   I want to blow up Di Giorgio's house and kill
him;" that in the upstairs room of Lanasa's house in Balti-
more, Russo said: "They have killed Rei; now we will blow
up Di Giorgio's house with dynamite and kill Di Giorgio."
"Tony Lanasa also said this same remark as Russo did;"
that Lanasa said he had sent two men to blow up the house.

In order to lay the foundation to discredit and impeach
this witness, by showing that he had made certain statements
tending to exculpate Lanasa from all connection with the
crime of which he was accused, counsel for Lanasa asked the
witness the following question: "Did you not at the City
Jail on Thursday, March 26th, 1908, about 8 o'clock A. M.,
say to Mr. George Penniman and Mr. Harry Wolf that you
were not guilty of the charge against you?"   This question
was objected to by the State, and the Court ruled that before
the question should be permitted to be propounded to the
witness the nature of the relationship existing or attempted
to be created by Messrs. Penniman and Wolf on the occasion
of that visit should be more clearly established.   Mr. Penni-
man was then called and testified as to the object of his visit
to Lupo in the City Jail, and give the circumstances under
which certain statements were made to him by Lupo.   At
the conclusion of Mr. Penniman's evidence the counsel for
Lanasa propounded to the witness the following questions:
"Did you at the City Jail on Thursday, March 26th, 1908,
at about 8.30 A. M., say to Mr. George Dobbin Penniman
and Mr. Harry Wolf: That you were not guilty of the

charge against you? That your attorneys wanted you to
plead guilty, but that they could not fool you and that you
were not going to do anything like that? That they were
trying to take your life? That the confessions were not
true? That after you had talked with Dimarco for an hour
and a half he went out with his tail between his legs? That
all in the papers about pleading guilty was not true, as no one
could talk for you? That after they took you to Court you
would cry out in Court 'that Mr. Dimarco was not my law-
yer, but I want Mr. Wolf'? That subsequently at the end
of the conversation you asked Mr. Penniman and Mr. Wolf
·to meet you at the jail at 8.30 A. M., Saturday, March 28th,
when you would employ them as your counsel and give them
your defense? And that you wanted to stand trial?"

Upon objection by the State the Court refused to permit
the witness to answer. The record states "To which offer, as
so made, the State objected, and the Court sustained the ob-
jection, and refused to permit the defendant to prove said
offer." The trial Court treated the statements made by Lupo
to Mr. Penniman as confidential communications between at-
torney and client. We cannot so consider them. We have
been referred to no case, and we have been unable to discover
·one, in which statements made under the circumstances dis-
closed by the record have been held to be privileged, and it
would be an undue extension of the doctrine to hold it appli-
cable to this case. The subject of confidential communica-
tions between attorney and client has been fully treated by
this Court. The result of the authorities is that to make the
communications privileged they must be made during the
existence of the actual relation of attorney and client, or dur-
ing interviews and negotiations looking to the establishment
of such a relationship between the parties, and must relate
to professional advice and to the subject-matter about which
such advice is sought. When such conditions exist the law
will not permit the counsel to divulge the communications
without the consent of the client. In *Chase's Case,* 1 Bland,
222, the Chancellor said: "The policy of the law does not

permit a solicitor to divulge the secrets of his client. Such confidential communications are not to be revealed at any period of time, either before or after the suit has been brought to an end, or in any other case; for, as to all such matters, his mouth is shut forever." The same principle is announced in *Chew* v. *Farmers' Bank,* 2 Md. Ch. 240; *Fulton* v. *Mac-Cracken,* 18 Md. 543. In *Chew's Case, supra,* the Chancellor said: "But, although the rule is thus inflexible in the cases to which it applies, there are what are sometimes called exceptions to it, although these exceptions are rather apparent than real, and will, I think, be found upon examination to be entirely without the principle upon which the rule rests. That is, they will be found, not to be communications from the client to the legal adviser at all, but information which the latter had acquired independently of any such communication. And when that is the case the interests of justice, so far from requiring that it shall be locked up in the breast of the attorney, demand its publicity when necessary to guard or to assert the rights of the third persons."

The record shows that Mr. Penniman, who was counsel for Lanasa, had heard that Lupo was being subjected in the jail to some improper treatment. The evidence does not show the exact information conveyed to him; but it caused him to think that some improper influence was being used upon the prisoner—"that something was being done which should not be done," and he wanted to get at the bottom of it and see what the trouble was. That he did not go there as counsel for Lupo and had no thought of such employment, and it was not pretended by Lupo that he regarded Mr. Penniman as his counsel or legal adviser at any time, and as a matter of fact he was never so employed. During the interview which took place under these circumstances, Lupo, it is said, made the statement referred to in the questions embraced in this exception, and Mr. Penniman testified that at the time they were made the relation of lawyer and client did not exist, nor was such a relationship mentioned in any way, nor had it occurred to him. This is undisputed. But "after every-

thing was said," to use the language of Mr. Penniman, the question of his employment was broached, and an arrangement was made that he should return on the following Saturday, when Lupo "would give us his defense." He did go to the jail on Saturday, but Lupo declined to see him, and never did give him his defense so far as the record shows.

We think it clear that the facts do not bring these statements within the rule as to confidential communications. The witness should have been required to answer, and if he had denied the statement attributed to him, Mr. Penniman should have been permitted to contradict him, if he could do so, as such evidence would have had a direct tendency to discredit the witness upon a most material point in the case, viz, the connection of Lanasa with the conspiracy.

For precisely the same reason there was reversible error in the ruling on the question embraced in the twenty-fifth exception. Joseph Tamburo, one of the defendants, had testified to certain facts tending to show the guilt of the appellant. Among other things, he swore that he was present in the upper room of Lanasa's house on the occasion testified to by Lupo and heard the appellant say that he had sent two men to blow up the house of Di Giorgio. The defense proposed to contradict him upon this point by two witnesses, by showing that Tamburo had stated that he was not present at Lanasa's home on the occasion testified to by him and Lupo, and that he knew nothing about the trouble. Such testimony was clearly admissible, and its exclusion was well calculated to do the appellant injury.

The thirtieth to the thirty-sixth exceptions inclusive present substantially the same questions. The testimony of Joseph Tamburo had been contradicted, and for the purpose of supporting his credibility he was recalled by the State in rebuttal. *Thirty-nine days after the commission of the crime,* and while he was in the custody of the police department of Baltimore City, he made to F. P. Di Maio, the superintendent of Pinkerton's National Detective Agency, in the presence of three members of the Baltimore City De-

tective Department, a statement which was reduced to writing and sworn to by him before a notary public. This statement, over the objection of the traverser, was admitted in evidence in corroboration of Tamburo's testimony in chief. If it be conceded that the statement is not excluded by *section 3, Article 35, of the Code of 1904,* we are of opinion that such a statement by one jointly indicted with the appellant for the identical crime for which he was being tried, made so long after the commission of the offense and under the circumstances disclosed by the record, does not fall within the exception to the general rule "which excludes mere hearsay evidence, because *ex parte* and without the sanction of an oath." The rule which admits such testimony in corroboration of the evidence of an impeached witness is one which is "not very generally recognized in the Courts of England, or of other States in this Country, and it should not be *extended,* but *applied strictly.* *Maitland* v. *Bank,* 40 Md. 559." In all the cases in this Court in which such evidence has been admitted it appears that the corroborating statement was made immediately, or soon after the transaction. *Cooke* v. *Curtis,* 6 H. & J. 93; *Washington Fire Insurance Company* v. *Davison,* 30 Md. 105; *McAleer* v. *Horsey,* 35 Md. 464; *Maitland* v. *Citizens' Bank,* 40 Md. 559; *Bloomer* v. *The State,* 48 Md. 537; *Mallonee* v. *Duff,* 72 Md. 286. In the case of the *City Passenger Railway Company* v. *Knee,* 83 Md. 78, we said:: "Ever since the case of *King* v. *Parker,* 3 Doug. 242, it is well settled, according to the weight of authority, that 'what a witness says not upon oath, will not be admitted to confirm what he said upon oath.' *Robb* v. *Hackley,* 23 Wend. 55; *Conrad* v. *Griffey,* 11 Howard, 490. But though this is the general rule, the text writers agree that most Courts have held that there 'may be many cases where, under special circumstances, it possibly might be admissible; as, for instance, in contradiction of evidence tending to show that the account was a fabrication of a late date, and where, consequently, it becomes material to show that the same account had been given before its ultimate effect

and operation, arising from a change of circumstances, could have been foreseen.' 2 *Starkie on Ev.,* marginal page 187; 1 *Wharton on Ev.,* sec. 570; *Rapalje's Law of Witnesses,* sec. 224; *Taylor's Ev.,* sec. 1330.

"This exception to the general rule seems to rest upon the theory that the witness, having been impeached by evidence showing that he has testified under corrupt motives, or has fabricated his testimony to meet the exigencies of the case, the fact that he uttered the same statement, shortly after the transaction, and before the motive to fabricate existed, tends to support not only his integrity, but also the accuracy of his recollection. To bring the case within this exception it must appear that the conversation occurred *soon after the transaction,* is consistent with the statements made on oath, and contains such fact or facts pertinent to the issues involved, as reasonably to furnish to the jury some test of the witnesses integrity and accuracy of recollection. And this is the rule that obtains in Maryland."

The appellant was accused of a crime of great atrocity; but he was entitled to all the presumptions and to all the safeguards which the law has provided for the protection of the personal liberty of the citizen. He was presumed to be innocent, and this presumption was an absolute protection against conviction and punishment until it was overcome by proof which placed his guilt beyond any reasonable doubt. This presumption attended him throughout all the proceedings against him from the beginning until his conviction after a fair and impartial trial. He had a right to be judged by the law of the land; and where it appears, as it does by this record, that he has been denied the benefit of substantial rights during the progress of the trial, it is the duty of this Court to reverse the judgment and award a new trial.

*Judgment reversed and new trial awarded.*