PEOPLE *v.* SARTORI.

1. HOMICIDE — EVIDENCE OF SIMILAR ACTS — RES GESTÆ — MURDER.

In a prosecution for murder, evidence showing that the son of the deceased victim was killed at the same time by having his throat cut was admissible.

2. SAME — MATERIALITY.

Whether or not the evidence was material, the admission of testimony concerning an arrangement for a meeting between the deceased and one who was jointly accused with respondent was not prejudicial error.

3. EVIDENCE—ADMISSIONS—CRIMINAL LAW—PRESUMPTIONS—CONFESSION.

The mere fact that a respondent under arrest and in jail made a statement of the alleged facts concerning the crime to the prosecutor in the presence of an interpreter does not give rise to a presumption that his statement was involuntary.

4. SAME—LEADING QUESTIONS—TRIAL.

The permitting of leading questions is very largely discretionary with the trial judge.

5. SAME—WITNESSES—PHYSICAL CONDITION.

Testimony relating to the physical condition of one of the principal witnesses for the prosecution, and to her alleged paralyzed condition, was not improperly received.

6. SAME—DECLARATIONS AGAINST INTEREST—HEARSAY.

Nor was it improper to reject testimony of a witness that a third person had admitted that he committed the murder: evidence of such conversation was hearsay, as would also be a statement that another killed decedent.

7. APPEAL AND ERROR — ARGUMENT OF PROSECUTOR — SAVING QUESTIONS FOR REVIEW—EXCEPTION.

Exceptions to argument of the prosecutor taken without any request for a ruling by the court were insufficient to warrant a reversal.

8. SAME.

Where the court is asked to rule, and neglects or omits to do so, the effect is the same as an adverse ruling upon the objection.

9. SAME—TRIAL—CONDUCT OF PROSECUTOR.

Reference of a general sort by the prosecuting attorney to the fact that respondent and his witnesses were foreigners was not reversible error.

10. CRIMINAL LAW—EXAMINATION—WAIVER.

The objection that respondent had no preliminary examination was presented too late, on motion for a new trial; and the respondent waived the right by declining to take the stand when asked if he desired to do so by the court.

11. SAME—APPEAL AND ERROR.

The court will not consider piecemeal a request to charge which was refused, and which is not claimed to have been, as a whole, erroneously refused.

12. SAME—NEW TRIAL.

*Held*, on a consideration of the entire record, that the verdict was not against the weight of the evidence.

Error to Kent; Perkins, J. Submitted November 17, 1911. (Docket No. 192.) Decided January 23, 1912.

Bartolomeo Sartori was convicted of murder. Affirmed.

*George Clapperton* and *C. G. Turner*, for appellant.

*Franz C. Kuhn*, Attorney General, and *William B. Brown*, Prosecuting Attorney, for the people.

BLAIR, J. The respondent was tried and convicted of murder under an information charging that:

"Bartolomeo Sartori, Gustavo Iacovoni, and Ulderico Iacovoni, late of the township of Walker of the county of Kent, on, to wit, the 5th day of September, 1909, at the township of Walker, Kent county, aforesaid, did feloniously, wilfully, and the said Bartolomeo Sartori of his malice aforethought, and the said Gustavo Iacovoni of his malice aforethought, and the said Ulderico Iacovoni of his malice aforethought, then and there did kill and murder one Mario Pavoni."

The Iacovonis demanded separate trials, and respondent Sartori was tried first. Some nine months later, the respondent Ulderico Iacovoni, son of the respondent Gustavo Iacovoni, was tried and acquitted, whereupon a *nolle prosequi* was entered against Gustavo.

Mario Pavoni lived upon a rough, very hilly piece of land, upon which was an old run-down peach orchard. His house stood upon the north side of an east and west highway near the foot of a hill. The hill began at the highway and extended upward at an angle of 35 degrees 250 to 300 feet, then down on the other side across a narrow valley, and then up another hill not so high or steep as the first. The top of this second hill was about 750 feet from the house in which Pavoni lived, and north of the house. East of this peach orchard was a strip of woods, at Pavoni's east line. North of Pavoni's land, about one-third of a mile, was another peach orchard,

which extended to a little lake further north, and which lake was about a mile from Pavoni's house. The second hill above referred to sloped to a deep valley, beyond which was a third hill.

Mrs. Pavoni testified: That she and her husband got up at about 6:30 o'clock on Sunday morning, September 5th, and their son Alfredo, 12 years old, got up four or five minutes later. That her husband went out "saying that he would go right over the hill and look over the peach orchard." That Alfredo went after the cow. That after her husband started up the hill Gustavo Iacovoni came to the house, and, 30 or 40 feet behind the house, and towards the woods, she saw Sartori and Ulderico Iacovoni going up the hill. At this time, her husband, who had got about halfway up the hill, turned and came back and joined in the conversation. That her husband went back up the hill with Gustavo, and she saw them as far as the top of the hill. That the Iacovonis and Sartori had guns, but her husband did not. That near the top of the hill her husband tried, as appeared by his motions, to get Gustavo's gun, but did not succeed. That some four or five minutes after her husband went over the hill Alfredo followed him. That four or five minutes after her son passed the hill she heard two shots, and then screams of her husband, followed by screams from her son. That thereupon she fell off the steps in a hysterical fit.

Vincennes De Petris, a boarder at Pavoni's, testified that he saw Alfredo go over the hill, and six or seven minutes after he went over the first hill he heard two shots with hardly any interval between them, maybe a second, and then he heard the cry.

"As soon as the shots were heard, Pavoni's wife began to holler and cry that they killed both, and of course he put attention to Pavoni's wife."

In a short time he went over the hill, finding Hugo Imperi there at the top of the hill. Hugo had no gun. That they then went on and found the bodies of Pavoni

and his son near the top of the second hill. The body of Pavoni lay some 80 or 90 feet west of the woods on his east line and from 10 to 15 feet further south than the body of his son. A trail of blood showed that he had dragged himself some 25 or 30 feet down the hill. There were shots on the east side of a peach tree near where Pavoni was killed, showing that the charges came from the east. There were numerous shot in Pavoni's body, his wrist was shattered, there were powder marks and bruises on his neck, and his face was scratched up. There were two knife wounds penetrating his lungs, which the coroner said were the direct cause of his death. The boy had been killed by three separate cuts across and around his throat with a knife.

No witness testified that he saw the murder committed, but Sartori testified to what occurred upon his being overtaken by Pavoni; and, upon the trial of Ulderico Iacovoni, he and his father testified upon the same subject. According to Sartori:

" He hadn't seen Pavoni until when he saw him right in his back on the third hill."

That prior to that day Pavoni, "He say, 'Don't come near my land nor in my house.'" That after Pavoni ordered him off his land, Pavoni tried to get Gustavo's gun, and, failing, became enraged and jumped towards him, whereupon he, backing up, threw down his cap in front of Pavoni and told him that if he passed the cap he would "do away with" him. That thereupon Pavoni backed away and started for home, saying, as he went away:

" Saturday I will have my own gun, and then we will see one another."

That then Sartori and the Iacovonis went away towards the lake. That he did not see Alfredo that morning and did not again see Mario Pavoni. On the way to the lake he heard two shots at an interval of about a second

apart back towards Pavoni. That "they had then walked about 200 meters probably, or more." That he never thought to look back to see where the shots came from, but continued on his way to the lake. That he intended to shoot Pavoni in the leg if he passed the cap.

There was testimony tending to show enmity between Pavoni and Sartori growing out of Sartori's alleged advice to Mrs. Pavoni to run away with a young man by the name of Guarino De Bartolomeo, and that each had threatened the life of the other. Pavoni had forbidden Sartori to come near his land or in his house.

Respondent's assignments of error, upon which he relies for a reversal, are as follows:

(1) That the said trial court erred in admitting testimony in relation to the killing of the boy Alfredo Pavoni.

(2) There was an error in admitting the following questions and answers:

"*Q.* Do you know whether or not Iacovoni had arranged with Pavoni to have Pavoni come over to Iacovoni's that night?

"*A.* Yes, sir.

"*Q.* What was the arrangement about? Why did Pavoni agree to come over to Iacovoni's? What was it that Pavoni was coming over there to see about?"

(3) That the court erred in refusing to strike out the testimony of Guiliani, who acted as an interpreter in quizzing the respondent in the jail immediately after their arrest.

(4) The court erred in admitting the answers to leading questions found on pages 143 and 189 of the record.

(5) The court erred in admitting the witness Innocence Pavoni to testify in relation to her own physical condition.

(6) The court erred in excluding the testimony of Joseph Martini in relation to what Sacciucci told him the morning after the murder about the killing of Pavoni.

(7) The court erred in permitting the remarks of counsel for the people in his opening and closing argument to the jury, to which objection was made by counsel for respondent, and which appear in the record.

(8) That the court erred in proceeding with the trial of this case without previous examination of the respondent or waiver of examination by him.

(9) That the court erred in denying to give the respondent's request to charge.

(10) The court erred in denying the motions for a new trial made on behalf of the respondent Sartori.

1. The court did not err in permitting evidence of the boy's wounds. *People* v. *Marble*, 38 Mich. 117; *People* v. *Foley*, 64 Mich. 148 (31 N. W. 94); *People* v. *Wright*, 89 Mich. 70 (50 N. W. 792).

2. These questions related to an arrangement between Pavoni and Iacovoni to go to Grand Rapids and get a bicycle previously loaned to Pavoni by Iacovoni and which Pavoni had left at a shop for repairs. We do not perceive how the admission of this testimony, if erroneous, was in any wise prejudicial to respondent.

3. The witness Guiliani was called to the jail after the arrest of the respondent to act as an interpreter of the questions put by the prosecuting attorney and the answers of Sartori. He was called and examined on the trial by the prosecution without objection and cross-examined at length by respondent's counsel. After the next witness had been sworn and a few preliminary questions answered, the following occurred:

"*Mr. Turner:* Just a minute. I want to make a motion for the purpose of getting it on the record there, your honor. I move that all this testimony by the witness just sworn before this one, John Guiliani, or something like that, be stricken out from the record on the ground that Sartori at that time was arrested and in the hands of the law, so to speak, and subjected to a cross-examination by the prosecutor down there with no one to represent him, and whatever he said, if he did say anything, was an involuntary statement, brought out by that kind of a process; in other words, it was making him testify against himself. I ask to have that testimony stricken out on that ground.

"*The Court:* I will think that over.

"*Mr. Turner:* And the same in relation to this witness, your honor.

"*The Court:* I will reserve the determination of the question until later. We will let it stand.

"*Q.* Herman, do you remember the day you were down in the jail talking with Sartori and Iacovonis?

"*A.* Yes.

"*Q.* You were down there?

"*A.* Yes, sir.

"*Q.* What day of the week was that?

"*A.* Tuesday.

"*Mr. Turner:* Just a minute, Brother Brown. May the same objection, your honor, apply to this witness?

"*The Court:* It may.

"*Mr. Turner:* And an exception."

The court .did not overrule the motion of respondent's counsel, but let the testimony already taken stand and reserved the question of its competency until later. The only exception taken appears to apply to the testimony then being given by the witness Mancheralli. The matter does not appear to have been again brought to the attention of the court, and there is no basis for the assignment of error. *People* v. *Van Driesche,* 154 Mich. 158 (117 N. W. 578).

Furthermore, there is no testimony as to whether the statements were voluntary or involuntary, and we do not think that the mere fact that the respondent was in the jail under arrest raises a presumption that the statements were involuntary.

4. The objection is not to the answers given, but to the leading form of the questions. The questions to Mrs. Pavoni and the answers were as follows:

"*Q.* What did he say to you that he would do in reference to killing your husband?"

And the interpreter replied:

"*A.* She say that if he would see that her husband would show act of doing him harm, he would kill him.

"*Q.* What did he say about being willing to kill your husband, if you would go away with him? * * *

"*Q.* And what did she know about Sartori—what did you know about Sartori that made you think that there was going to be trouble?

"*Mr. Turner:* Objected to as leading, and an exception.

"*The Court:* Go ahead; ask the question.

"*A.* Because she knew that they had a quarrel before.

"*Q.* Then when you asked Vincennes De Petris to go up with your husband, you thought he was in danger from Sartori, didn't you?

"*Mr. Turner:* That is objected to as leading and an exception.

"*The Court:* Go ahead.

"*A.* Yes."

The permitting of leading questions is very largely within the discretion of the circuit judge, and counsel on both sides were given wide latitude in this regard. We do not think there was such an abuse of discretion as to warrant a reversal of the case.

5. As stated in respondent's brief:

"This witness, Mrs. Pavoni, was repeatedly interrogated in relation to her physical condition. On one occasion she was led to testify that she had been sick all the previous night. On another, that she walked only with assistance; her side being paralyzed. Again, it was announced that the doctor was coming to see her, and he desired to ask her a few more questions, if that could be done. This could only furnish a basis for comment to the jury, and tend to work upon their sympathy, to the prejudice of respondent."

We think it was proper to show to the jury the physical condition of this most important witness in order that they might intelligently weigh her testimony.

6. Respondent's witness Joseph Martini testified that he had a talk with Antonio Sacciucci the day after the tragedy. It was the theory of respondent that Sacciucci was the man who committed the murder, and several suspicious acts and circumstances were testified to against him. Martini was asked:

"*Q.* Did you have any talk with him there about who did the killing?

"*A.* Yes, sir."

He was then asked for the conversation, which was objected to as hearsay, and the objection was sustained. The ruling was correct. Whether Sacciucci would have answered that he saw some one else commit the murder, or whether, as the record indicates was expected, he would say that Sacciucci told him that he himself committed the murder, would be alike hearsay. The acts of Sacciucci having some relation to the crime and tending to show that he committed it instead of Sartori were competent and were admitted; his declarations, statements, and admissions not part of the *res gestæ* were not competent. *People* v. *Stevens*, 47 Mich. 411 (11 N. W. 220); *Commonwealth* v. *Chabbock*, 1 Mass. 144; *State* v. *Hack*, 118 Mo. 92 (23 S. W. 1089); *Rhea* v. *State*, 10 Yerg. (Tenn.) 258; *People* v. *Hall*, 94 Cal. 595 (30 Pac. 7); *Robison* v. *State*, 114 Ga. 445 (40 S. E. 253); *Hauk* v. *State*, 148 Ind. 238 (46 N. E. 127, 47 N. E. 465); *State* v. *Sale*, 119 Iowa, 1 (92 N. W. 680, 95 N. W. 193); *State* v. *West*, 45 La. Ann. 928 (13 South. 173); *Munshower* v. *State*, 55 Md. 11, 18 (39 Am. Rep. 414); *Commonwealth* v. *Densmore*, 12 Allen (Mass.), 535; *State* v. *Fletcher*, 24 Or. 295, 300 (33 Pac. 575).

7. Except in one instance counsel for respondent contented himself with taking an exception to particular portions of the argument of the prosecuting attorney without asking for, or obtaining, a ruling thereon by the court. Under repeated rulings of this court, such exceptions cannot be considered. *Maclean* v. *Scripps*, 52 Mich. 214 (17 N. W. 815, 18 N. W. 209); *Miller* v. *Lachman*, 117 Mich. 68 (75 N. W. 284); *Mayo* v. *Wright*, 63 Mich. 32 (29 N. W. 832); *Pierson* v. *Railroad Co.*, 149 Mich. 167 (112 N. W. 923); *Formiller* v. *Railway*, 164 Mich. 653 (130 N. W. 347); *Meade* v. *Railway*, 165 Mich. 489 (130 N. W. 1114). The one instance where a ruling was asked was as follows:

" And I want to say to you now that that one case of Martini shows you that the people of a country, not born in this country, who do not speak our language, these people are

more inclined on general principles, some little time after a murder has been committed, to side with the live man than they are with the dead man.

"*Mr. Turner:* Give me an exception to that.

"*Mr. Brown:* On general principles, a man, other things being equal, after the acrimony and shock of the immediate event has passed away—

"*Mr. Turner:* I call the court's attention to that statement.

"*Mr. Brown:* The—

"*Mr. Turner:* Wait just a moment, Mr. Brown. I call the court's attention to the statement Brother Brown makes that people of a foreign country coming here are more apt to side with the live man than they are with the dead—

"*Mr. Brown:* And in evidence of that fact—

"*Mr. Turner:* And I ask the court to tell the jury not to pay any attention to that statement.

"*Mr. Brown:* As I was saying, this man Martini, after he talked to me—

"*Mr. Turner:* Give me an exception."

Where, as in this instance, the attention of the court is called to the objection, a ruling requested, and no ruling made, we think the effect of the refusal or failure to rule should be held to be the same as an adverse ruling.

The witness Adolph Martini, although his name was on the information, was called by the defendant and testified:

"*Q.* Did you know Pavoni?

"*A.* Yes.

"*Q.* Did you ever hear him say anything about Sacciucci?

"*A.* He says that he heard several times Pavoni say that he want to drink the blood of Bartolomeo Sartori, of Bartolomeo Guarino, of Piero, and Tony Sacciucci.

"*Q.* Wanted to drink the blood, is that it?

"*A.* Yes, sir.

"*Q.* Where did you hear him say that?

"*A.* In the month while his wife was away.    *    *    *

"*Q.* Did he say why he wanted to drink their blood?

"*A.* Because they had ruined his home.

"*Q.* Did he say what Sacciucci had done towards him?

"*A.* He said that he gave some kind of medicine to his wife."

On cross-examination the witness admitted that he came to the prosecuting attorney of his own accord and told him what he knew about the case in the presence of an officer by the name of Sargeant, but denied that he said to him that he had heard Sartori say three or four times that he would kill Pavoni. Mr. Sargeant testified that he heard the conversation referred to, and that Martini did say to the prosecuting attorney that he heard Sartori say three or four different times that he would shoot Pavoni. So far as Martini was concerned, the prosecuting attorney was justified by the record in his statement. While it would have been better if he had omitted foreigners generally from his statement, we do not think it could be justly held that his general reference could have prejudiced the respondent. *People* v. *Sharp*, 163 Mich. 79 (127 N. W. 758).

8. This point was not made until the motion for a new trial, and was then too late. *Conger* v. *Hall*, 158 Mich. 447 (122 N. W. 1073).

We are also of the opinion that the examination was waived. Several witnesses were examined on behalf of the people and cross-examined by counsel for the Iacovonis; Sartori not being represented by counsel. At the conclusion of the testimony the following questions were put to Sartori through the interpreter:

"*Q.* Mr. Sartori, do you want to examine any of the witnesses in this case, in your defense, or in your behalf ?

" *The Court:* At this time ?

"*A.* He says the testimony has been introduced, and he is satisfied with that.

"*Q.* Do you want to go on the stand yourself here ?

"*A.* He says he wants to be examined.

"*Q.* Here ?  Now ?

"*A.* He leaves it entirely with the court.

"*Q.* It's up to him.

"*A.* He says let him be examined now.

"*Q.* Who ?

"*A.* This man here (meaning Mr. Magini).

" *The Court:* Himself ?

"*Q.* Does Sartori want to be examined now ?

"*A.* He wants to be examined now.

" *The Court:* Tell him the Iacovonis are not going to be examined now.

"*A.* He says he will do like the others.

"*Q.* Ask him if he wants to go on the stand here or not. He can go on the stand and tell his story if he desires ?

"*A.* He says he does like the others. He agrees with the others.

"*Q.* Then you don't want to be examined now ?

"*A.* No."

9. Under this assignment, counsel argue that:

" The court should have given to the jury that portion of respondent's request to charge which reads as follows:

" 'I charge you that the mere fact of Sartori being in the vicinity of the crime when it was committed is no evidence that he committed the crime, and the mere fact of his being in the vicinity where the crime was committed, and the further fact that Pavoni had made threats against him, and the mere fact that some months before Sartori said that he would protect himself by using a gun, if necessary, would not in itself be any evidence of murder.' "

The portion of the request constitutes about half of the request as presented. We cannot consider requests to charge piecemeal, and, since it is not contended that the court erred in refusing the request as a whole, we decline to further consider the question.

10. This assignment raises the question most relied upon by counsel for respondent in their printed brief and in the oral argument before this court. The verdict of guilty was rendered October 11, 1909, and was followed by sentence for life at the Marquette prison on October 12, 1909. Some time in June of 1910, a motion was made on behalf of respondent for a new trial. The motion itself has not been returned, and the only means we have of ascertaining its grounds is from the reasons filed by the circuit judge in denying it July 20, 1910, wherein it is said:

" It is urged in support of the motion: (1) That Sartori and the two Iacovonis having been jointly charged with these murders, and separate trials having been de-

manded, Sartori, being first tried, was therefore deprived of the testimony of the Iacovonis in his behalf; (2) that the subsequent trial of the younger Iacovoni resulted in his acquittal, and afterwards a *nolle prosequi* was entered as to the elder Iacovoni, and these facts should be considered as indicating at least the probable innocence of Sartori; (3) that on the trial of her son, the younger Iacovoni, Mrs. Iacovoni testified that her brother Sacciucci confessed to her before leaving the country that he was guilty of these murders."

The reasons which influenced the circuit judge to deny the motion are substantially stated in the first paragraph thereof, as follows:

"I am still convinced, as I was at the conclusion of the trial, that no mistake was made by the jury in its verdict of guilty in this case. A horrible double murder was committed, and all of the facts and circumstances showed with unerring certainty that Sartori, either alone or in company with others, is responsible for the crime. He had debauched Pavoni's household, had been forbidden by Pavoni to set foot upon his land, and the deepest feelings of hatred existed between them."

After a statement of the facts influencing his judgment, at some length, the trial judge concluded:

"I do not think that justice requires a new trial of this case. The respondent was ably defended. Many witnesses were called and testified in his behalf at the county's expense, and every effort possible was made to give him a fair trial. The overwhelming weight of the circumstances, in connection with his own testimony, led the jury to believe that he was guilty as charged; and it seems to me, under the undisputed testimony in the case, they were justified in reaching that conclusion."

On the 15th day of September, 1910, a second motion for a new trial was filed by respondent's counsel, based upon the following grounds:

(1) The records and files in said cause.

(2) The records and files in the case of People v. Ulderico Iacovoni in this court.

(3) Newly and after discovered evidence consisting of

168 MICH.—21.

testimony of Gustavo Iacovoni, Ulderico Iacovoni, Angelina Sacciucci and Philomena Iacovoni taken in the said trial of Ulderico Iacovoni.

(4) The affidavits of respondents, Gustavo Iacovoni, Ulderico Iacovoni, Herman Mancheralli, and George Clapperton attached hereto and made a part of this motion, setting forth new and after discovered evidence.

October 5, 1910, the circuit judge filed an order denying the second motion, saying:

"I am unable to find any new or additional reasons advanced on this motion which should lead me to change the opinion already expressed and on file on the first motion."

On the 24th day of August, 1910, the bill of exceptions, including the assignments of error, was settled and signed by the circuit judge. On April 6, 1911, by the order of this court, the respondent was permitted to review the case upon the typewritten record; the printing of the record under the rule being dispensed with. The index to the typewritten record does not comply with Rule 36 in stating "the page of the record where any exception relied on may be found." This failure has greatly increased our labor in the examination of this voluminous typewritten record.

The reading of the entire bill of exceptions and the records and files returned to this court, however, fails to disclose any exceptions claimed or filed to the reasons for the order or the order itself denying the motions for a new trial. Under such circumstances, we have repeatedly held that we cannot consider the motions. *Comstock* v. *Taggart*, 156 Mich. 47 (120 N. W. 29), and cases cited; *U. S. Graphite Co.* v. *Saginaw Circuit Judge*, 158 Mich. 598 (123 N. W. 27). Our examination of the record, however, has satisfied us that we would not have been warranted in overruling the order denying a new trial on the ground that justice required it, if exceptions had been properly filed.

It is apparent that the trial judge was as earnest in his conviction of the guilt of the respondent as his counsel are of his innocence. The circuit judge, also, who saw these witnesses upon the stand, and the jury, to whom their testimony was addressed, and who were taken to view the premises, had an advantage over any one merely reading the record of their testimony in determining the credibility of the witnesses; and, the trial judge having set the seal of his approval upon the verdict of the jury, the case must be strong indeed to authorize this court to overturn his decision.

"The verdict must be clearly against the great weight of the evidence, to require this court to overrule the decision of the circuit judge refusing a new trial." *Gardiner* v. *Courtright*, 165 Mich. 54 (130 N. W. 322), and numerous cases cited.

See, also, *People* v. *Francis*, 52 Mich. 575 (18 N. W. 364); *People* v. *Moore*, 52 Mich. 563 (18 N. W. 359); *People* v. *Girdler*, 65 Mich. 68 (31 N. W. 624).

We agree with the circuit judge that the verdict was in accordance with, and not against, the weight of the evidence.

The judgment is affirmed.

McALVAY, STONE, OSTRANDER, and BIRD, JJ., concurred.