## PEOPLE v ERNEST EDWARDS

### OPINION OF THE COURT

1. COURTS—SUPREME COURT—COURT OF APPEALS—RULES OF LAW.

   Once a rule of law has been promulgated by the Supreme Court of Michigan, that rule may not be altered by the Court of Appeals, however outdated or unwise the Court of Appeals may think the rule.

2. CRIMINAL LAW—EVIDENCE—HEARSAY RULE—DECLARATIONS AGAINST PENAL INTEREST.

   Testimony that a deceased person had admitted having committed the crime with which defendant was charged was properly excluded by the trial judge as hearsay because the exception to the hearsay rule for declarations against interest does not include declarations against penal interest.

3. CRIMINAL LAW—INSTRUCTIONS TO JURY.

   The adequacy of instructions to a jury must be determined from the instructions as a whole, not from fragments.

4. HOMICIDE—SECOND-DEGREE MURDER—MANSLAUGHTER—INSTRUCTIONS TO JURY.

   The trial court adequately distinguished second-degree murder from manslaughter where the jury was instructed clearly and at length to find defendant guilty of manslaughter if they determined that he killed the victim, but not during an attempted robbery, if defendant's reason had been overwhelmed by some provocation, and if there had not been adequate time for defendant's passion to cool.

5. CRIMINAL LAW—SENTENCING—JUVENILE RECORD.

   The likelihood that a defendant's sentence was influenced by the court's knowledge of his juvenile record is so strong where the

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur 2d, Courts § 183 *et seq.*
[2] 29 Am Jur 2d, Evidence § 541.
[3, 4] 53 Am Jur, Trial § 525.
[5, 6] 47 Am Jur 2d, Juvenile Courts and Delinquent and Dependent Children §§ 4, 8.

presentence report submitted to the trial court prior to sentencing detailed defendant's juvenile record, even though the transcript of the proceeding at which defendant was sentenced does not indicate whether the court considered the juvenile record in assessing an appropriate sentence, that a new presentence report must be prepared omitting any reference to defendant's juvenile record, and a different judge must be assigned to resentence defendant.

DISSENT BY PETERSON, J.

6. CRIMINAL LAW—SENTENCING—JUVENILE RECORD—STATUTES.

*The language of the statute which proscribes the use of a disposition of any child or any evidence given in a juvenile proceeding as evidence in any court against the child for any purpose whatever does not require that a convicted murderer cannot be sentenced by the judge before whom he was tried because that judge had knowledge of the murderer's juvenile misdeeds (MCLA 712A.23).*

Appeal from Saginaw, Fred J. Borchard, J. Submitted Division 3 March 9, 1973, at Grand Rapids. (Docket No. 13732.) Decided May 23, 1973. Leave to appeal granted, 390 Mich 787.

Ernest Edwards was convicted of second-degree murder. Defendant appeals. Affirmed and remanded for resentencing.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *George E. Thick, II,* Prosecuting Attorney, and *Ray J. MacNeil,* Assistant Prosecuting Attorney, for the people.

*Michael C. Moran,* Assistant State Appellate Defender, for defendant.

Before: R. B. BURNS, P. J., and T. M. BURNS and PETERSON,* JJ.

R. B. BURNS, P. J. Defendant was charged with

* Circuit judge, sitting on the Court of Appeals by assignment.

having murdered Robert Stevens while attempting to rob him (felony murder). MCLA 750.316; MSA 28.548. Depending upon the jury's assessment of the credibility of assorted witnesses, both prosecution and defense, the evidence presented justified any of the following findings of fact: that defendant killed Stevens while attempting to rob him; that defendant killed Stevens, but not during an attempted robbery; or that Stevens was killed by someone other than defendant. Accordingly, the jury was instructed as to four possible verdicts: guilty of first-degree murder, of second-degree murder, or of manslaughter; and not guilty.[1] Defendant was convicted of second-degree murder. He appeals.

I.

At defendant's trial John Longuemire testified that Chester Blake had, prior to his death, admitted killing Stevens. Pursuant to objection by the prosecutor, the trial judge instructed the jury to disregard Longuemire's testimony. Defendant claims that the trial court erred reversibly in so doing. Defendant concedes that any admission of guilt by Blake does not come within the traditional exception to the hearsay rule for declarations against proprietary or pecuniary interest. However, defendant asks us to join many other jurisdictions which have expanded the exception for declarations against interest to include declarations against penal interest. That we cannot do.

Once a rule has been promulgated by the Supreme Court of this state, that rule may not be altered by this Court, however outdated or unwise

---

[1] It was anticipation of this very type of case that prompted the decision in *People v Wimbush*, 45 Mich App 42 (1973), and its disagreement with *People v Bufkin*, 43 Mich App 585 (1972).

we may think the rule. *People v Getterson,* 31
Mich App 124, 127–128 (1971); *People v Alvin
Reed,* 43 Mich App 556 (1972).

The instant case is indistinguishable from *People v Sartori,* 168 Mich 308, 316–317 (1912), which
case has never been overruled:

"6. Respondent's witness Joseph Martini testified that
he had a talk with Antonio Sacciucci the day after the
tragedy. It was the theory of respondent that Sacciucci
was the man who committed the murder, and several
suspicious acts and circumstances were testified to
against him. Martini was asked:

" *'Q.* Did you have any talk with him there about who
did the killing?

" *'A.* Yes, sir.'

"He was then asked for the conversation, which was
objected to as hearsay, and the objection was sustained.
The ruling was correct. Whether Sacciucci would have
answered that he saw some one else commit the murder, or whether, as the record indicates was expected,
he would say that Sacciucci told him that he himself
committed the murder, would be alike hearsay. The
acts of Sacciucci having some relation to the crime and
tending to show that he committed it instead of Sartori
were competent and were admitted; his declarations,
statements, and admissions not part of the *res gestae*
were not competent."

At the time of Sartori's trial Antonio Sacciucci
was not available to testify because he had left the
country. Therefore, if declarations against penal
interest were admissible as an exception to the
hearsay rule, the Supreme Court would have permitted Joseph Martini to testify about Sacciucci's
alleged admission.

The *Sartori* decision has not been overruled by
the recent case of *Chambers v Mississippi,* 410 US
284; 93 S Ct 1038; 35 L Ed 2d 297 (1973). In
*Chambers* one Gabe McDonald made a sworn and

written statement to Chambers' attorneys, admitting guilt of the crime with which Chambers was charged and exonerating Chambers. At trial McDonald repudiated his statement. The trial court refused to allow defense counsel to examine McDonald as an adverse witness and refused to accept into evidence McDonald's written admission, because not a declaration against proprietary or pecuniary interest. The trial court also refused to allow 3 witnesses to testify as to other inculpatory statements of McDonald. The Supreme Court reversed, not because a hearsay exception limited to proprietary or pecuniary interest is unconstitutional, but because the refusal of the trial court to allow examination of McDonald as an adverse witness, its refusal to admit McDonald's sworn statement, and its refusal to allow testimony by others as to additional inculpatory statements by McDonald combined to deny Chambers a fair trial. The Supreme Court was also impressed with the extrinsic evidence presented by Chambers corroborating McDonald's statement. The high Court concluded:

"[T]he exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." 410 US at 302–303; 93 S Ct at 1049; 35 L Ed 2d at 313.

In the instant case defendant presented no ex-

trinsic evidence to corroborate Blake's alleged confession and Blake's statement was not made under oath or in writing, indicia of trustworthiness.

## II.

In its instructions the trial court informed the jury that second-degree murder differed from first-degree murder because "done under sudden impulse without premeditation or previous intention" and that manslaughter is an intentional killing done under "sudden passion caused by some provocation". Defendant claims that the trial court failed to adequately distinguish between second-degree murder and manslaughter. We disagree.

Had the trial court told the jury no more than that second-degree murder results from "sudden impulse" and manslaughter results from "sudden passion", we would agree with defendant that the instructions were deficient. However, defendant bases his claim of error on fragments of a lengthy instruction taken out of context. The adequacy of instructions must be determined from the instructions as a whole, not from fragments. *People v Dye,* 356 Mich 271, 279 (1959). In the instant case the jury was instructed clearly and at length to find defendant guilty of manslaughter if they determined that he killed Robert Stevens, but not during an attempted robbery, if defendant's reason had been overwhelmed by some provocation, and if there had not been adequate time for defendant's passion to cool. We are convinced that the jury understood the difference between first-degree murder, second-degree murder, and manslaughter, and that the jury's verdict of guilty of second-degree murder was a finding by them that defendant's reason had not been overwhelmed by passion.

## III.

The presentence report submitted to the trial court prior to defendant's sentencing detailed defendant's juvenile record. Although the transcript of the proceeding at which defendant was sentenced does not indicate whether the court considered defendant's juvenile record in assessing an appropriate sentence, the likelihood that defendant's sentence was influenced by the court's knowledge of his juvenile record is so strong we remand for resentencing, order that a new presentence report be prepared, omitting any reference to defendant's juvenile record, and order that the Court Administrator assign a judge from other than the Tenth Circuit to resentence defendant. *People v McFarlin,* 41 Mich App 116 (1972); *People v Chappell* 44 Mich App 204 (1972); *cf. People v Hildabridle,* 45 Mich App 93 (1973).

Affirmed, except as to sentence. Remanded for resentencing.

T. M. BURNS, J., concurred.

PETERSON, J. *(dissenting).* I concur except as to the remand for resentencing. Entirely apart from the sense that we are out of perspective in holding that a convicted murderer cannot be sentenced by the judge before whom he was tried because that judge had knowledge of the murder's juvenile misdeeds, I cannot accept the construction given MCLA 712A.23, MSA 27.3178 (598.23) by *People v McFarlin,* 41 Mich App 116 (1972), and *McFarlin's* progeny. The statute provides:

"A disposition of any child under this chapter, or any evidence given in such case, shall not in any civil, criminal or any other cause or proceeding whatever in

any court, be lawful or proper evidence against such child for any purpose whatever, except in subsequent cases against the same child under this chapter."

The language of the statute is not that of sweeping privilege. To the contrary, it is precise and limited. The only things proscribed are:

(1) A *disposition* of any child under this chapter, or,

(2) Any *evidence given* in such case. The only time and place when such things are proscribed is as "evidence",[1] "in any court"[2] when used "against such child".[3]

*McFarlin,* using the language of the dissent in *People v Charles Williams,* 384 Mich 753 (1970), abandons the statutory language in favor of an absolute cloak over the "juvenile record". It is done on a rationale, both of juvenile proceedings and of what may be considered in sentencing, that to this writer is neither logical, practical nor consistent with the correctional aims of society as to either juveniles or adults. So *McFarlin,* at p 126, relying upon *McKeiver v Pennsylvania,* 403 US 528; 91 S Ct 1976; 29 L Ed 2d 647 (1971), which held that there was no constitutional right to jury trial in juvenile proceedings, says:

"The constitutional rights afforded juveniles have

---

[1] *People v Coleman,* 19 Mich App 250 (1969).

[2] Excepting the juvenile court "in subsequent cases against the same child". It would seem anomalous in our one court of justice that such matters could be used at the juvenile court level in subsequent cases involving the child, but could not be usefully employed by a different branch of the court at a later date.

[3] The use of the words "such child" suggest that the proscription ends when the subject ceases to be a child. Despite sweeping dicta in many cases, no Michigan case has held to the contrary. Cases barring use of juvenile dispositions for impeachment of an adult witness may be simply explained by the fact that juvenile proceedings are not, by definition, criminal actions. MCLA 712A.1; MSA 27.3178(598.1). *Cf. People v Warren,* 23 Mich App 20 (1970).

been held to be substantially less than those given to adult offenders. This has been justified on the basis that juvenile proceedings are not criminal in nature and therefore they carry none of the long-range consequences inherent in a criminal conviction. Having adopted this view of juvenile proceedings, we find it unsound to allow a trial judge to rely on the prior juvenile record of a defendant at sentencing, when that record is compiled by a procedure inapposite to our criminal justice system.

"The noncriminal nature of the juvenile court proceeding in Michigan would be subverted if a juvenile's record could somehow find its way into a criminal trial even if it be solely for purposes of determining sentencing."

While this statement appears to this writer to be inaccurate and imprecise in several particulars,[4] it is of concern here because of the conclusion that the "juvenile record" may not be considered in sentencing because "compiled by a procedure inapposite to our criminal justice system". Inapposite? Different, yes; but inapposite? And what information apposite to sentencing is compiled by a procedure apposite to our criminal justice system? Not merely, I trust, prior criminal convictions demonstrably obtained within constitutional safeguards.

The Code of Criminal Procedure requires more:

"Before sentencing any person charged with a felony,

---

[4] I find nothing in *McKeiver* that suggests that because juvenile proceedings are labeled noncriminal in nature, they therefore carry none of the long-range consequences inherent in criminal conviction. *Cf. In re Gault*, 387 US 1; 87 S Ct 1428; 18 L Ed 2d 527 (1967). I suspect that most juvenile court judges would consider the consequences of the juvenile's contact with the court and its supportive institutions of greater import and longer consequence than the average criminal sentence.

Neither do I discern how the consideration of juvenile history in the sentencing of an adult offender would subvert the noncriminal nature of juvenile court proceedings.

* * * the probation officer shall inquire into the antecedents, character and circumstances of such person or persons, and shall report thereon in writing to such court or magistrate."[5]

This provision is consistent with the view, inadequately implemented though it may be in terms of treatment resources, that the adult correctional process no less than that provided by the juvenile code is intended to be just that, correctional. Under our present Code of Criminal Procedure the trial judge is entrusted, indeed obligated, with the critical first stage of the process, weighing factors of punishment, public safety, and rehabilitation in every case.[6] Notwithstanding the frustration and inadequacies of our available correctional resources, 16 years of personal experience and the shared experiences of fellow juvenile and circuit court judges have not altered the writer's commitment to the remedial process. In any discipline, the first step of a remedial process is diagnosis. The presentence report is the vehicle by which diagnostic data is conveyed to the court.

Thus, the sentencing judge is ideally concerned with more than an act, or symptom, if you will, that brings a defendant before him. The occurrence of like acts in the past, whether at the juvenile or adult level, are not inapposite, but relevant. The adult offender did not instanter become either an adult or an offender. No intelligent remedial prescription (sentence) is possible

[5] MCLA 771.14; MSA 28.1144. Note also that the statute requires that the presentence report go to the Department of Corrections, and, in case of institutional commitment, to the appropriate institution to be incorporated as part of the defendant's file there, presumably upon a legislative determination that such information is vital in the correctional process.

[6] A discretionary role, colored by the knowledge that where institutional commitment is indicated, the defendant, with rare exceptions, will be back in society sooner or later.

without knowledge of the causative factors which have brought the defendant to his present position. It is not possible to know too much about the defendant's capabilities, education, family strengths and weaknesses, the influences or the lack thereof that were brought to bear upon him during his formative years, and the resources upon which he may draw for strength. It is not enough to know that he has encountered past societal consequences for deviant behavior, without knowing what those consequences were and what means of treating him have proven promising, successful, or unbeneficial.

Since I read both the Code of Criminal Procedure and the juvenile code as being consistent with a remedial philosophy of penology, I am concerned with aspects of *McFarlin* which appear destructive of that end. In the first place, the seeming conclusion that a "juvenile record", because known to the sentencing judge, is a fortiori considered "in aggravation of sentence", is in itself an anachronism in modern penology, foreclosing any concept that such information good, bad, or both, could be useful if not necessary for the good of the defendant.

Of more concern is the abandonment of the precise statutory language foreclosing "evidence" of "a disposition" or "evidence given" in the juvenile proceedings in favor of the proscription of knowledge of the defendant's "juvenile record". What is a juvenile record? The contents of the juvenile court file? The knowledge of the juvenile court investigators, probation officers, and staff? Police records? School records? Past events as such? Or is it the entire history of the juvenile years?

Still more alarming is the premise implicit in

*McFarlin,* that the only factors permissibly considered in sentencing are those which are the product of the constitutionally protected criminal justice system. Any attempt to impose vague due process formalisms to the exercise of sentencing discretion and the gathering of relevant data necessary therefor, or to substitute an adversary evidentiary hearing, is not only impractical but destructive of the very ends thought to be achieved by a humane sentencing philosophy and the indeterminate sentence system. So long as the sentencing power is a judicial function,[7] sources of presentence data must be kept open. The presentence report must not be truncated but expanded. Discretion cannot be exercised wisely in a vacuum. To reduce the court's knowledge to what is admitted or proven in a judicial proceeding is to foreclose the exercise of discretion and abort the purpose of the correctional process, or to dictate the erection of a monstrous new judicial machinery for dispositional determinations.

Consider the futility of remand in this case, under the mandate of *McFarlin,* to another judge because the trial judge was tainted by too much knowledge. The mere transfer will in itself serve as a flag to alert the next judge that a defendant transferred to him for sentencing has something in his past of sufficient seriousness as presumably to have foreclosed fair sentencing by the first judge.[8]

---

[7] And if the sentencing function is separated from the judicial function, no questions are avoided; they only lurk in a different forum, with disposition and correctional confinement being subject to determination by administrative process or parole boards. If every exercise of discretion is suspect, even a return to determinate sentencing would not eliminate such questions since the choice of charge or reductions thereof by plea bargaining entail the exercise of prosecutorial and judicial discretion.

[8] It is not alone knowledge of juvenile records, of course, that may corrupt the mind of the sentencing judge; *e.g.,* knowledge of pending cases or untried charges. See *People v Grimmett,* 388 Mich 590 (1972). *Cf. People v Lotze,* 47 Mich App 460 (1973).

There are, of course, enormous practical burdens
flowing from commitment to this principle. Aside
from the expense and inconvenience of the inter-
change of judges in rural circuits, one must note
that it is not alone in the rural circuits that judges
have knowledge of juvenile history of those who
appear before them as criminal defendants. Every
judge of criminal jurisdiction who has previously
served as a prosecuting attorney or as juvenile
court judge would be disqualified from sentencing
any person with whom, in his former official capac-
ity, he had dealt as a juvenile. If this kind of
knowledge really does give rise to a due process
question, then how can the right of the defendant
to be sentenced by a judge untainted by such
knowledge be limited to the scope of the record of
the judge's comments in sentencing or the presen-
tence report? Is he not entitled to have a hearing
to determine whether the judge in fact does pos-
sess such tainted knowledge about him? If this be
a Cassandra view, then I can only say that if
*McFarlin* is the path of inexorable logic of expand-
ing due process considerations, it is a path leading
backwards in penology towards the abolition of the
indeterminate sentence system.