## PEOPLE *v.* DYE.

1. CRIMINAL LAW—ASSAULT WITH INTENT TO DO GREAT BODILY HARM LESS THAN THE CRIME OF MURDER—EVIDENCE.

   Conviction of assault with intent to do great bodily harm less than the crime of murder is not disturbed as against the great weight of the evidence, where evidence presented by prosecution and defense was in conflict and there was sufficient to support jury's verdict, as an appellant is not entitled to a redetermination of facts in the Supreme Court (CL 1948, § 750.84).

2. SAME—ASSAULT—EVIDENCE—INSTRUCTIONS—DIRECTED VERDICT— INCLUDED OFFENSE.

   Evidence presented in prosecution for assault with intent to commit the crime of murder *held,* sufficient to sustain the trial court's instructions regarding the 4 different theories of assault, to sustain his refusal to direct a verdict of not guilty and to support verdict of assault with intent to do great bodily harm less than the crime of murder (CL 1948, §§ 750.83, 750.84).

3. SAME—EXAMINATION OF WITNESSES—DISCRETION OF COURT.

   Allowing the prosecutor in prosecution of defendant, an attorney, for assault with intent to commit the crime of murder to bring out certain allegedly irrelevant and collateral matters pertaining to defendant's married life, his professional experience and training, and various other things *held,* not to have constituted an abuse of discretion on the part of the trial court, where record shows prosecutor was making a good-faith effort to show a motive for the crime and to attack the credibility and show possible bias of defendant and certain of his witnesses (CL 1948, § 750.83).

4. SAME—EXAMINATION OF WITNESSES—DISCRETION OF COURT.

   The trial court necessarily possesses a broad discretion in the matter of allowing counsel to examine and cross-examine witnesses in the trial of a person accused of crime and unless that discretion is abused the Supreme Court will not interfere.

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error § 857.
[3, 4] 58 Am Jur, Witnesses §§ 621, 624, 625.
[6] 53 Am Jur, Trial § 842.

5. SAME—REJECTED TESTIMONY—CUMULATIVE TESTIMONY.

Possible error of trial court in denying defendant, during his trial on charge of assault with intent to commit murder, of the right to introduce some of his proffered testimony as to violent nature of the complaining witness and of defendant's fear of such complainant *held*, harmless and not reversible, where such rejected testimony was merely cumulative even if relevant (CL 1948, § 750.83).

6. SAME—INSTRUCTIONS.

Jury instructions in a criminal case must be read in their entirety and short excerpts therefrom will not be taken out of context and found inadequate.

7. SAME—INSTRUCTIONS.

Instructions given in prosecution for assault with intent to commit the crime of murder, which had been carefully prepared with the cooperation of counsel on both sides and read to the jury, when taken in their entirety, *held*, to have been quite adequate to the comparatively simple issues in the case (CL 1948, § 750.83).

Appeal from Oakland; Adams (Clark J.), J. Submitted January 15, 1959. (Docket No. 61, Calendar No. 47,401.) Decided June 5, 1959. Rehearing denied July 13, 1959. Certiorari denied by the Supreme Court of the United States January 11, 1960.

Clifford B. Dye was convicted of assault with intent to do great bodily harm less than the crime of murder. Affirmed.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Frederick C. Ziem,* Prosecuting Attorney, *George F. Taylor, G. Edson Hallock,* and *Robert L. Templen,* Assistant Prosecuting Attorneys, for the people.

*Andrew J. Transue (Guy W. Selby* and *Walter G. Krapohl,* of counsel), for defendant.

*James E. Haggerty,* for defendant on application for rehearing.

VOELKER, J.  On August 26, 1955 defendant-appellant Clifford B. Dye allegedly assaulted one William Clark with a dangerous weapon, to-wit: a 25-caliber semiautomatic pistol.  At the time of the claimed assault 4 shots were fired, one of which struck and lodged in Clark's abdominal area.  Defendant Dye, a practicing lawyer, in Fenton, Michigan, was charged with assault with intent to commit the crime of murder* and convicted of the lesser included offense of assault with intent to do great bodily harm less than the crime of murder.†  Upon leave granted, he has appealed.

Defendant and complainant first became acquainted about 2 years before the alleged assault, when Clark retained defendant to represent him in a legal matter.  Shortly thereafter the two entered a farm tenancy relationship, wherein Clark as tenant leased a farm controlled by defendant as attorney-in-fact for his sister, who lived in Kentucky.  Thereunder Clark acquired pasturage and other use of certain adjoining farm lands (also owned by the sister), including the property upon which defendant was living and upon which the alleged assault occurred.  The agreement was that Clark was to develop a dairy farm and that the parties were to divide the expenses and profits.

In the beginning it appears that all went well, but as time went on and profits increased the friendly relationship cooled.  Finally at almost every meeting the parties had heated arguments, at least one of which resulted in physical violence for which complainant Clark was accused, tried and acquitted of assault and battery.  At the present trial Clark claimed that the cause of their trouble was the defendant's desire to oust him from the farm (which

---

* See CL 1948, § 750.83 (Stat Ann § 28.278).—REPORTER.
† See CL 1948, § 750.84 (Stat Ann § 28.279).—REPORTER.

farm Clark claims was, in reality, owned by the defendant and put in his sister's name to avoid the claims of creditors and various of his former wives) and that to accomplish his purpose the defendant commenced a campaign of harassment, including the service of many legal papers, threats of extensive litigation if Clark retained an attorney, a suit in equity for an accounting, and the cutting off of Clark's income by withholding the farm's milk checks. Defendant denies this and claims that the sole cause of the friction was Clark's violent nature.

On the day of the shooting Clark had driven his truck through defendant's farm so as to do his farm chores, as he had done regularly in the past. His wife and children accompanied him, the latter remaining in the truck, while Clark advanced to the barn. The wife, who testified at the trial, later followed her husband and witnessed most of what transpired. From this point the stories are so conflicting that they cannot possibly be reconciled.

In a nutshell it is complainant Clark's story that after he and defendant first confronted each other on the latter's farm at some distance (18 or more feet); that defendant produced a pistol from his person, brandished it in complainant's direction, and fired into the ground; that Clark, whose wife and children were in the near background, determined to close in and disarm the defendant so as to protect his family and himself; that while they were still some distance apart defendant fired 2 more shots, one of which hit and lodged in Clark's abdominal area; that in the ensuing struggle for the gun, after Clark closed in, still another shot was fired, which hit no one.

Appellant flatly disagreed with this version and testified that at all times Clark was the sole aggressor; that he, the defendant, retreated as soon as he saw Clark; that there was a violent exchange of

words and that Clark began to pursue him; that defendant was in mortal fear of his life because of Clark's alleged violent nature and the previous trouble between them, so he drew his pistol from his pocket and shot into the ground hoping to prevent Clark from chasing him further. Defendant claims further that he, an older man, retreated as fast and as far as he was able; that Clark pursued and overtook him and grappled for the gun, cursing and threatening to use it to kill the appellant, and that somehow in the melee the gun was discharged, injuring Clark. In other words, the defendant's defense is one of self-defense plus a claim that in any event the shooting which wounded Clark was accidental.

Appellant's first and fifth questions on appeal are:

"1. (a) Did the court err in failing to direct a verdict of not guilty?

"(b) Did the court err in submitting to the jury the charges of assault with intent to murder, assault with intent to do great bodily harm, felonious assault and assault and battery?

"(c) Was the verdict against the great weight of the evidence?"

"5. Should the respondent's motion for a new trial have been granted?"

There is accordingly much discussion in the briefs on both sides regarding appellant's claim of self-defense and the related subject of his need to retreat when he was, as he claims, "in his own backyard." In this connection much is sought to be made of the fact that an expert witness for the people testified that he found powder burns on complainant's clothing—thus showing, as appellant claims, that Clark was shot at close range, and further showing, as appellant also claims, that he had indeed retreated and was pursued and overtaken

by the homicidal Clark, whereupon, during the ensuing struggle, the gun was accidentally discharged.

On this score we need only point out that the expert witness did not say Clark was *shot* at close range, but merely that one or more shots appear to have been *fired* at close range, which was not seriously disputed by anyone. As for the disputed claim of self-defense, retreat, and all the rest—the jury heard the conflicting stories and apparently took more stock in Clark's version than in the defendant's. We see no reason to change the result. We also observe that if complainant's story was believed (that he was first shot at by defendant at some distance and before he, Clark, had made any move toward the defendant, hostile or otherwise), subsequent claimed retreat and acts of self-defense by defendant would be irrelevant.

In essence then, appellant seeks to question the sufficiency of the people's evidence. Defendant is not entitled to a redetermination of the facts in this Court; they were settled by the jury and we will not go into their determination so long as there was sufficient evidence presented from which the jury might have found the defendant guilty beyond a reasonable doubt. We think there was.

We are not happy to note that because of the extreme self-serving nature of the briefs and appendices presented here on both sides, we found it necessary, in order to get a fair picture of the evidence, to make a careful study of the entire trial transcript, no easy chore. The transcript not only contained sufficient testimony, if believed, to support the verdict, but also to sustain the court's refusal to direct a verdict of not guilty and also to sustain the court's instructions regarding the 4 different categories of assault. Under the information filed and evidence

presented in this case we believe the jury was warranted in convicting for the offense for which it found defendant guilty.

Appellant's second question is:

"2. (a) Was the conduct of the assistant prosecuting attorney unfair, improper and prejudicial so as to constitute reversible error?

"(b) Did the court err in failing to hold the assistant prosecuting attorney in check in the matters referred to in question (a)?

"(c) Did the court err in overruling the respondent's several objections to the matters referred to in question (a)?

"(d) Did the court err in overruling the respondent's request that a mistrial be declared?"

Defendant claims support for the above contentions by alleging that the court erred in allowing the prosecutor by direct and cross-examination to bring out and refer to certain allegedly irrelevant and collateral matters pertaining to the defendant's varied marital life, his ownership of property, his professional experience and training, and numerous other things. From our study of the trial transcript we are of the opinion that in so doing the prosecutor was in good faith attempting to show a motive for the crime and to attack the credibility and show the possible bias of the defendant and certain of his witnesses. Although there is much in the transcript that might well have been omitted, we do not feel that the uncalled for matter in any way prejudiced the rights of the defendant. In this area the trial court necessarily possesses a broad discretion, and unless that discretion is abused this Court will not interfere. We find no such abuse. (See, generally, 1 Gillespie, Michigan Criminal Law and Procedure [2d ed], §§ 400, 401, and cases cited therein.)

Appellant's third question is:

"Did the court err in refusing to permit the respondent, under the claim of self-defense, to recite in evidence knowledge received by him from third parties, prior to the alleged assault, of incidents of violence and brutality on the part of the prosecuting witness (Clark)?"

For purposes of this opinion we will assume, without deciding, that the court did err in not admitting the proffered testimony. That leaves the question of whether or not that error, in light of the other testimony presented, was prejudicial to defendant's cause. To so determine we must look at the surrounding facts.

Defendant by the forbidden testimony sought to show a fearful state of mind, so as to substantiate his claim of self-defense. We glean from our study of the transcript of the testimony that appellant was allowed to testify to many other claimed violent acts by the complainant, some that the complainant himself had allegedly told defendant about, and others within defendant's own knowledge. He was then allowed to give the names of the several people who had allegedly told him of still other violent acts committed by the complainant. By so doing we think he adequately got across his idea, that is, that he feared the complainant because of his tendency toward violence. Any further testimony that he may have given on the subject, although possibly relevant, would have been merely cumulative. Thus, although it may technically have been error to reject the proffered testimony, we think that in the light of the other evidence presented that error, if any, was rendered harmless. Our holding is not weakened by the fact, already noted, that the evidence indicates the offense here may have been completed before the complainant ever made any move toward defendant, hostile or otherwise.

Appellant further claims that the court erred in its charge to the jury. To sustain that allegation he has extracted several short excerpts from the entire context of the charge and discussed their claimed inadequacies at great length. Jury instructions in a criminal case, however, as well as in civil cases, must be read in their entirety. So tested we find these instructions (which were carefully prepared with the cooperation of counsel on both sides and read to the jury), were quite adequate to the comparatively simple issues in the case.

Affirmed.

SMITH, BLACK, EDWARDS, and KAVANAGH, JJ., concurred with VOELKER, J.

KELLY, J. (*dissenting*). Justice VOELKER, considering appellant's claim that the conduct of the assistant prosecuting attorney was "unfair, improper and prejudicial so as to constitute reversible error," found that: "Although there is much in the transcript that might well have been omitted, we do not feel that the uncalled for matter in any way prejudiced the rights of the defendant." I do not agree with that conclusion and, hence, this dissent.

The defendant, 54 years of age at time of trial, had, for some time before the day of the shooting, complained of heart trouble and this fact was known to the complainant.

Complainant was a young man of 27 years of age, over 6 feet in height, and possessed a pugnacious nature. His belief that he had a right to express his dislikes by physical force is clearly established by his testimony, and this fact was known to defendant.

Defendant testified that on May 7, 1955, he was assaulted and choked by complainant; that the State

Police were called and, after they had interrogated him, he heard the State Police advise the prosecutor, over the telephone, that they observed the marks of choking on defendant's throat. This testimony was neither refuted nor denied by State Police testimony.

On May 11, 1955, defendant started an action for accounting in the Oakland circuit court to determine his rights in a rent dispute with the complainant, and obtained an injunction restraining complainant from molesting him. The shooting occurred in the early evening (August 26, 1955) and just a few hours before, in the afternoon, defendant had driven from his farm to the office of complainant's attorney and had had a conference with him. Complainant's attorney testified that he telephoned complainant's wife and informed her of that conference. Shortly after this telephone conversation, complainant and his wife drove to defendant's farm, where the shooting occurred.

There were 3 witnesses to the shooting, namely: Complaining witness, his wife, and defendant. Their testimony as to what occurred at the time and place of the shooting follows.

Complainant testified that the shot which hit him was fired by defendant when he was 18 feet from defendant and was not fired while he was wrestling with defendant. Complainant testified on re-direct examination:

"Mr. Dye reached his hand in his pocket and pulled out a gun and was playing with it or something and it went off in the ground. * * * He pulled the gun out and hit me in the stomach—18 feet apart. The next time he shot, the gun, he missed me by not over 3 feet. At that time I realized he meant business. My wife and children were crying. I was out. I had the bullet. I figured if I got the gun, the rest of the jury and people could take care of him.

I didn't know if I was going to live or die at that time. I kept moving. I didn't drop. Blood kept coming out of my mouth. My main idea was to get in my pick-up and get out of there. and I tried to do so. * * *

"*Q.* Did you have any conversation with anyone, Dye, or your wife or anyone else at that time?

"*A.* Mr. Taylor, blood was coming from my mouth and the main thing I wanted was my wife to get the gun."

On cross-examination, complainant testified:

"*Q.* Mr. Clark, I will show you people's exhibit 7 and ask you whether or not you recognize the man appearing in that picture as depicting a position where you and Mr. Dye fell on the ground outside the gate between the gate and Dye's house?

"*A.* Somewhere right around there, Mr. Smith, or a little bit this way. In the barnyard your gate is open a little too far now. The gate was open just enough for Mr. Dye to slide into.

"*Q.* Did you have a hold of Mr. Dye at the time he went down?

"*A.* When he fell to the ground?

"*Q.* Yes?

"*A.* Yes, I was trying to get that gun.

"*Q.* How did you have hold of him?

"*A.* I had hold of his arms.

"*Q.* At the time he fell were you 2 men facing one another?

"*A.* Yes, sir. * * * He had his hands up—by that time I had his hands up like this here. We went down together. We got tangled with the gate.

"*Q.* You had hold of his wrists and as Mr. Dye fell, you fell on top of him or at the side of him, something of that nature?

"*A.* Yes, sir.

"*Q.* Was the gun discharged at that time?

"*A.* No, sir. I couldn't say if it was. * * * When we was getting through that gate we got tangled up in the gate.

"*Q.* What happened then?

"*A.* We just went to the ground and Cliff was trying to get hold of the gun all the time. I finally got his arms up where I thought I could hold him until I got a few pains and I figured I was shot and I figured the best thing was to get out of there. * * *

"*Q.* How close were you to Mr. Dye when the last shot was fired?

"*A.* Well, I say between 15 and 18 feet. * * *

"*Q.* Did you tussle with Mr. Dye up the hill towards this gate?

"*A.* I guess we had to. I don't remember. I don't just recall what I did. I know I had hold of him and my wife picked the gun up.

"*Q.* How many shots were fired?

"*A.* I could count 3. I know of 3 of them. I couldn't say if there was any more or there wasn't."

Defendant testified that the shot that hit complainant was accidentally fired while he was on the ground and while complaining witness was on top of him. On cross-examination he said:

"As he started to run toward me, after the conversation I just related on the north side of the barn when I said to let me alone, I fired a shot. I started to run. I was running sidewise and I fired a shot in front of his feet on the ground, at the ground and I continued running and so did he. He didn't even hesitate. * * *

"*Q.* Pardon me. I'm sorry to keep interrupting you. I'd like to know the best judgment as to the position you were in at that time?

"*A.* I would say at that time I would be perhaps on, I would say I would be a little bit past that window that is on the north side that shows in that picture that we had there. I would be a little west of that.

"*Q.* So we don't have to get the picture, where would that be, what portion of the length of the side of the barn?

"*A*. That would be I would say I was perhaps 2/3. I'd say I was at least 2/3 of the way to the gate from the corner of the barn.

"*Q*. Then what happened?

"*A*. Then I wheeled through the gate and I couldn't run any further. I stopped and as I spun through the gate I had to force it out. It isn't to open that way but I did. I whirled with the gate. As I did I was facing him as he came running. I said 'Don't come Bill; don't come, Bill. Let me alone.' I fired another shot hoping to frighten him.

"*Q*. Where did you direct that shot?

"*A*. Down. I didn't point the gun at him. I pointed it down in front of his feet as he ran.

"*Q*. And you fired that shot deliberately, too?

"*A*. Yes.

"*Q*. Then what happened?

"*A*. Just as he got, he stopped just a second then after he ran on a piece and then he says, he called me a vile name which I would't want to repeat here and he says 'I'll make you eat that G. d. pop gun you s.o.b. you.'

"*Q*. Now, at the time of the first shot, what is your best judgment as to the distance between you 2 men?

"*A*. At the time of the first shot I would say he was perhaps oh, 20 feet from me. At least 20 feet.

"*Q*. At the time of the second shot how far were you apart?

"*A*. I would say, oh, perhaps 10 feet.

"*Q*. Now, you have just related that you got through the gate and he uttered some oaths and said he would do something?

"*A*. Yes.

"*Q*. Where was he at that time?

"*A*. He just—he was just about to come through the gate.

"*Q*. Tell us what happened?

"*A*. * * * He shouted to her first. He shouted 'Lois, get around here where you can see this. Get around here where you can see this' and then he

closed in on me and he grabbed my hand, that had the gun in it, in both of his hands and he took that and he squeezed my hand and turned it back toward my face. 'Pull, God damn you. Pull it, God damn you' and the gun went off and I managed with the other hand to get it to go off away from my face. It went off somewhere into the air.

"*Q.* Then what happened?

"*A.* Then I of course realizing that he was going to truly make me 'eat that pop gun' as he called it, namely, he was going to kill me, and I made an awful wrench and at the same time he threw me and tripped me like and I went backwards right on my back and I hit the ground awfully hard with him coming right after me and as I hit the ground the gun went off again and just a split second, my thought was to get that out of his reach, I threw it back over my head a ways back up the hill. I never saw the gun again. He hollered just when the last shot went off, he hollered 'You shot me, you s.o.b. You shot me' and I saw a little piece of blood appear on his shirt here somewhere along in here and I saw he was shot and I said 'I'll take you to the hospital Bill, if you let me up. I'll take you to the hospital, if you let me up.' He says, 'No, b. G.,' he took the Lord's name in vain, 'I'm going to lay right on you here and die, G.d. you, s.o.b. you' and with that he commenced shouting loudly 'Lois, get around here. Hand me the gun. Hand me the gun.' I couldn't see her but finally he started saying 'Pick it up. There it is. There it is' and he'd lean over me and saying 'There it is. Can't you see it? Hand it here.'

"*Q.* Go ahead. What happened?

"*A.* He said 'I'm going to kill the chicken s.s.o.b. right, just where I want him,' and he said 'Wait,' and he flung some kind of a rag to her, * * * 'Pick it up with this and hand it here.' * * * And then he started looking over in the direction of my automobile which was between where we were and the truck and the children and he says 'Give it here' and

he kept calling louder and finally he got up off of me. 'Bring that gun.' When he got up off me, he just give me this by the throat and my shirt and he got up off of me and I raised up and I could see him kind of going real fast, walking fast past the end of my car out towards the truck, hollering 'Give it here, give it here I said.' "

Complainant's wife testified that the last shot fired was after her husband had grabbed defendant and in the struggle both her husband and defendant fell to the ground. She testified that defendant fired the first shot into the ground; that after this first shot her husband started approaching defendant. At the hearing before the justice of the peace, she testified that defendant was retreating, running sideways, but changed her testimony at the hearing by saying he was retreating backing up. She testified defendant shot the second time when her husband was 15 to 18 feet away from him; that the third shot was fired when her husband was going toward defendant; that finally he got hold of defendant and in tussling they fell to the ground, at which time she heard the fourth shot. She further testified that her husband asked her to get the gun, but she doesn't remember whether the gun was on the ground or whether she kicked it out of defendant's hand.

On the question whether the complainant's version that he was shot while 18 feet away from defendant, or defendant's version that the shot was fired after complainant had seized him and threw him to the ground, we have the all-important testimony of Wallace L. VanStratt, ballistic expert of the Michigan State Police. Justice VOELKER's only comment on his testimony is as follows:

"There is accordingly much discussion in the briefs on both sides regarding appellant's claim of

self-defense and the related subject of his need to retreat when he was, as he claims, 'in his own backyard.' In this connection much is sought to be made of the fact that an expert witness for the people testified that he found powder burns on complainant's clothing—thus showing, as appellant claims, that Clark was shot at close range, and further showing, as appellant also claims, that he had indeed retreated and was pursued and overtaken by the homicidal Clark, whereupon, during the ensuing struggle, the gun was accidentally discharged.

"On this score we need only point out that the expert witness did not say Clark was *shot* at close range, but merely that one or more shots appear to have been *fired* at close range, which was not seriously disputed by anyone."

Complaining witness Clark was shot only once, and the bullet entered the stomach area. There is no dispute that in close proximity to the point where the bullet entered Clark's body there were powder burns. No other testimony was offered in regard to powder burns, and because of the importance of this testimony, which was not contradicted, impeached or challenged, showing that the bullet which wounded complainant was shot from a gun not more than 18 inches from complainant's body, we set forth the testimony of State Police VanStratt:

"This was delivered to me at our State police laboratory on August 31, 1955, by Detective Barkell. He requested that I test an area of this shirt to determine whether or not any powder burns or powder particles from a fired cartridge were present on the shirt. * * *

"*Q.* Did you make a further determination to find any evidence of powder burns?

"*A.* I did.

"*Q.* And you so found powder burns did you not?

"*A.* I did.

"*Q.* And the area on that particular piece of apparel, does it in any way correlate with the place on the abdomen where you pointed the gun when we made this demonstration?

"*A.* I would say yes.  *  *  *

"*Q.* I am referring now to people's exhibit 5 which has been offered in evidence here and for a better understanding, the testimony shows that someone said that the parties standing there were in the same relationship as to distance as Mr. Dye was to Mr. Clark at the time there was an explosion. Would you say from that particular photograph that it would even be possible or remotely possible for powder burns to appear, on the undershirt, of a gun of this caliber, fired at that distance?

"*A.* No, sir, I do not believe so.  *  *  *

"*Q.* In other words, if it could happen, it would be an unusual exception, isn't that true?

"*A.* I would say it would be impossible to happen."

On cross-examination this witness was questioned as to the distance of the gun from the body at the time it went off:

"*Q.* In this particular case, and I don't care what you say in this particular case, what is your best judgment as to the distance that gun was from the body or the shirt at the time it went off?

"*A.* It is my opinion that the gun was held no closer than one foot but at least as close as 18 inches, approximately the 18-inch distance.  *  *  *

"*Q.* What would that determining factor be?

"*A.* The degree of powder that I found around the bullet hole."

Defendant pleaded self-defense and the burden of proof was upon the State to prove that it was not self-defense.

A grave and serious question as to whether the State had met this test was presented to the jury for determination. Under these conditions, the duty

rested squarely on the State to guard against prejudicial remarks and questions, or the introduction of improper collateral evidence. This duty was not met and, on the contrary, the record discloses that every effort by collateral attack and improper questions was made by the State to discredit and belittle the defendant.

The State endeavored to bring before the jury the fact that defendant had been married 5 times. Before defendant took the stand, the State elicited from complainant's wife the fact that defendant had domestic troubles and had been married several times. When objections were made the Court ruled that such testimony was improper, but this did not deter the State from asking defendant, "Isn't it a fact, Mr. Dye, that you have been married 5 times?"

The prosecuting attorney endeavored to prove by complainant's wife that defendant had asked her to forge his wife's name to a milk check, and followed this up by a series of questions that could only be considered by the jury as the State's contention that defendant was a man who placed all his property in others' names for the purpose of defrauding creditors and evading income tax.

Defendant was a justice of the peace in Kentucky before seeking and securing permission to practice law in this State. The State questioned the defendant as to the years he was a justice of the peace and the number of criminal cases he had conducted, and then brought to the stand Donald F. Winters, clerk of the Supreme Court, to prove that at the time defendant made application for admission to the Michigan bar he made different answers. While the defendant denied the fact placed in the jurors' minds that the State considered defendant a man who held himself above and beyond the law, the State raised

the point by asking him if he was not known in Kentucky as "I am the law Dye."

The State endeavored to prove that defendant might have a criminal record and was insane, by the prosecutor questioning him and holding up a paper in his hand which purported to be an application for a permit to carry a gun in Oakland county. The prosecutor referred to the fact that the question in regard to whether he had ever been convicted, or was insane, had not been answered. The prosecutor then asked questions that could only mean that the prosecutor had a right to conclude that failure to answer these questions was because defendant had been convicted and was insane.

The above are only a few of many calculated and definite efforts to discredit defendant through collateral attack.

While we realize the difficult case the prosecutor was confronted with, we quote with approval the following from *People* v. *Lieska,* 161 Mich 630, 638:

"Zeal in the prosecuting attorney is entitled to the highest commendation, but it must be exercised within proper limits. Witnesses are entitled to respectful consideration, and it is the duty of the courts to see that they are protected from the insinuations and attacks of counsel. Juries very properly regard the prosecuting attorney as unprejudiced, impartial, and nonpartisan, and insinuations thrown out by him regarding the credibility of witnesses for the defense are calculated to prejudice the respondent. As was said in *People* v. *Cahoon,* 88 Mich 456, these questions and insinuations reflected upon the character of the witnesses. The prosecuting attorney has no right to discredit the witness by innuendo. * * *

"We are constrained to say that the respondent did not have that fair and impartial trial which

the Constitution and laws of this State guarantee him."

The prosecutor's duty to guard against questions which tend to create prejudice in the minds of the jury was established by this Court in *People* v. *Kelsey,* 303 Mich 715, 718, 719, as follows:

"The prosecutor contends that the aforementioned cross-examination was for the purpose of testing the memory and credibility of the defendant. We think, however, that the interrogation went far beyond the boundaries of permissible cross-examination. Such an examination could have been for no other purpose than to create prejudice in the minds of the jurors. The tactics pursued have been previously condemned in *People* v. *Gotshall,* 123 Mich 474; *People* v. *Dowell,* 136 Mich 306; and *People* v. *Wright,* 294 Mich 20. Appellee contends, however, that complaint of the cross-examination cannot be made now because no objection was interposed thereto in the trial court. Ordinarily this is true, yet, as here, where serious error has been committed, this court should take cognizance of such error under our supervisory powers although no objection was made in the trial court. *People* v. *Holmes,* 292 Mich 212. For this reason, the case must be reversed and a new trial granted."

Many questions were asked that did not pertain to the facts surrounding the shooting, but were directed toward defendant's past life. These questions did not refer to a criminal record, but portrayed defendant as a man whom the average juror would not respect, or like. While defendant denied these collateral insinuations, we realize that jurors are prone to accept the facts as set forth in the prosecutor's questions rather than the defendant's denials.

We agree with defendant's statement "that the respondent was prevented from having a fair trial

because of the injection of prejudicial innuendo and evidence concerning irrelevant, incompetent, immaterial and collateral matters that were prejudicial to the respondent that included remarks in the people's opening statement and continued throughout the trial and in the final argument."

The verdict of guilty should be set aside and the case should be remanded for a new trial to be held without improper evidence or prejudicial conduct or remarks.

Judgment should be reversed and case remanded.

Dethmers, C. J.; and Carr, J., concurred with Kelly, J.